HICKEY v ZEZULKA (ON RESUBMISSION)

HICKEY v MICHIGAN STATE UNIVERSITY (ON RESUBMISSION)

Docket Nos. 86606-86608. Argued January 7, 1992 (Calendar No. 1).
    Decided May 20, 1992. Rehearing denied and text amended 440
    Mich 1203.

John Hickey, Jr., as personal representative of the estate of John
    Hickey, III, deceased, brought an action in the Ingham Circuit
    Court against Linda Zezulka, an officer of the Michigan State
    University Department of Public Safety, and others, alleging
    negligence, gross negligence, and intentional and grossly negli-
    gent acts in violation of Hickey's civil rights under 42 USC
    1983 for failure to remove Hickey's personal articles of cloth-
    ing, including his belt, when he was detained in a department
    holding cell where he committed suicide. In a second action
    against Michigan State University in the Court of Claims, the
    plaintiff claimed that the holding cell was dangerous or defec-
    tive and alleged violations of the decedent's civil rights. The
    cases were consolidated in the circuit court, Michael G. Harri-
    son, J., which entered judgment on a jury verdict for the
    plaintiff, finding that the failure to remove the belt was a
    ministerial act, not entitled lower-level governmental immu-
    nity, and that the decedent's civil rights had been violated.
    Michael G. Harrison, J., sitting for the Court of Claims, also
    found that the holding cell was dangerous or defective because
    it was not constructed as a detoxification cell. The Court of
    Appeals, M. J. Shamo, J. (Michael J. Kelly, P.J., concurring,
    and Sullivan, J., dissenting) affirmed, finding that the building
    was a proximate cause of the decedent's death, that Zezulka
    was not entitled to governmental immunity because her actions
    were ministerial-operational, and that the qualified immunity

REFERENCES

Am Jur 2d, Municipal, County, School, and State Tort Liability
    §§ 87-128; Negligence §§ 1128 et seq.; Penal and Correctional
    Institutions §§ 111, 207-208.
Civil liability of prison or jail authorities for self-inflicted injury or
    death of prisoner. 79 ALR3d 1210.
State's immunity from tort liability as dependent on governmental
    proprietary nature of function. 40 ALR2d 927.

defense to the § 1983 claim failed because it was not pleaded as an affirmative defense. It concluded that the trial court did not err in instructing the jury (Docket Nos. 90414, 90520, 101188). The defendants appealed. Following briefing and oral argument, the Supreme Court ordered reargument and supplemental briefing, limited to the trial court's refusal to instruct with regard to comparative negligence and superseding, intervening cause, and whether a jury may be asked to compare varying degrees of fault where a defendant claims the plaintiff's acts were intentional and the plaintiff claims the defendant's were negligent. 438 Mich 1202 (1991).

In an opinion by Justice BRICKLEY, joined by Justice LEVIN (except with regard to the building exception issue) and by Justice MALLETT, and an opinion by Justice RILEY, joined by Chief Justice CAVANAGH, and Justices BOYLE and GRIFFIN, the Supreme Court *held:*

The claim against Michigan State University is barred by state governmental immunity; the public building exception, MCL 691.1406; MSA 3.996(106), is inapplicable. Hickey presented insufficient evidence of deliberate indifference to support a claim under 42 USC 1983, requiring reversal of the trial court's denial of judgment notwithstanding the verdict with regard to the claim. Zezulka's actions are not afforded immunity because they were ministerial-operational; the trial court correctly refused to give jury instructions regarding intervening cause. However, the trial court erred in failing to instruct on comparative fault, requiring reversal of its decision regarding the plaintiff's negligence claim and remand for a new trial limited to the issue of the plaintiff's damages.

1. A governmental agency is immune from tort liability for actions undertaken while performing governmental functions. Although broad, this immunity is limited to a number of narrowly drawn exceptions, including the public building exception, where a plaintiff must prove that a governmental agency is involved, that the public building is open for use by members of the public, that a dangerous or defective condition of the building exists, that the governmental agency had actual or constructive knowledge of the alleged defect, and that it failed to remedy the defect after a reasonable period of time.

2. In general, governmental agencies are subject to liability without regard to whether it arises out of a failure to repair and maintain. While a public building may be dangerous or defective because of improper design, faulty construction, or absence of safety devices, a court should only look to the uses or activities for which the public building is assigned. The duty

imposed by the public building exception relates to dangers actually presented by the building itself. Whether a cell is dangerous or defective must be determined in light of the uses or activities for which it is specifically assigned. In this case, the holding cell was specifically intended and assigned for temporary detention and was not dangerous or defective. Nor was the decedent's death related to the maintenance of a safe public building for the specific use and purpose for which it was assigned. Thus, MSU is entitled to immunity, and the plaintiff's claim is barred.

3. A pretrial detainee's due process rights under the Fourteenth Amendment are protected to the same extent as rights guaranteed convicted prisoners under the Eighth Amendment. Thus, a constitutional violation in support of a § 1983 claim cannot be established absent a showing of deliberate indifference on the part of the defendant toward the due process rights of the pretrial detainee; mere negligence does not amount to deliberate indifference. The plaintiff presented insufficient evidence of deliberate indifference on the basis of the acts or omissions of Zezulka. Thus, judgment notwithstanding the verdict is to be entered for Zezulka on remand.

4. A person is entitled to state governmental immunity where it is shown that the person acted in good faith during the course and scope of employment and was performing discretionary, as opposed to ministerial, acts. The relevant inquiry is not whether the specific act at issue was negligent, but whether it was discretionary-decisional. Activities requiring personal deliberation, decision, and judgment are discretionary-decisional acts, while acts requiring mere obedience to orders or the performance of duties with little or no choice are ministerial-operational acts. Failure to follow established policies or security procedures are ministerial-operational actions to which governmental immunity does not apply. Although not every deviation from an established policy or rule is to be considered a ministerial-operational action, the preparation of a detainee for holding is. In this case, the defendant's actions in preparing the decedent for confinement and her alleged failure to monitor him were ministerial-operational activities not entitled to state governmental immunity.

5. An instruction to the jury that, after finding Zezulka negligent, it could relieve her of liability for negligence if it found that the decedent's suicide was not reasonably foreseeable was neither necessary nor appropriate, and thus the trial court properly refused to so instruct.

Justice RILEY, joined by Chief Justice CAVANAGH, and Jus-

tices BOYLE and GRIFFIN, writing for the majority, concurred with Justice BRICKLEY, except with respect to the issue of comparative fault.

6. As a general rule, a plaintiff may not recover damages in negligence for the intentional suicide of another. Where a plaintiff intentionally commits an act that brings about an injury, the risk of which was increased by the defendant's negligence, the plaintiff ordinarily loses any cause of action that might accrue because of the defendant's negligence. However, where the defendant assumes a duty to protect the plaintiff from an injury, the cause of action should not be lost. The defendant should not be required to assume all responsibility and liability for injuries occasioned by the plaintiff's intentional acts. The assumption of a duty to protect a person while in custody merely establishes a legal basis for finding negligence. The mere existence of a duty does not automatically lead to the conclusion that a decedent's fault should not be considered.

7. In this case, the decedent's fault, or the contributing cause of his injury, was his intentional and unreasonable exposure to the danger created by the defendant's negligence. Jurors are capable of reaching a rational and sensible balance between a decedent's fault and a negligent jailer's fault. Comparison of qualitatively different conduct, is not only possible, but is required by the Supreme Court's adoption of "pure" comparative fault. While the defendant should be held accountable for enhancing the risk of suicide, the decedent should also be held responsible for his own conduct.

Reversed and remanded.

Justice BRICKLEY, joined by Justices LEVIN and MALLETT, further stated that the trial court did not err in refusing to give the standard jury instruction regarding comparative negligence. An instruction regarding apportionment of fault is inappropriate in a jail suicide case.

Justice LEVIN, writing separately, stated that the findings of the Court of Claims judge support application of the building exception to governmental immunity, i.e., that the cell, used for the temporary detention of inebriated persons (its assigned use), was dangerous and defective, that the defect was a proximate cause of Hickey's death, and that the university had knowledge of the defect and failed to take action to protect those confined in the cell. The question is not whether any jail or holding cell could be made suicide proof, but, given the assigned use of this cell, whether it was dangerous and defective to the extent that, had it been more carefully designed or

constructed, or equipped with safety devices, Hickey's suicide would have been less likely to have occurred. Accordingly, the absence of expert testimony that a cell might be made "suicide proof" is not determinative.

177 Mich App 606; 443 NW2d 180 (1989) reversed and remanded.

1. CIVIL RIGHTS — JAIL SUICIDES — DELIBERATE INDIFFERENCE.

A pretrial detainee's due process rights under the Fourteenth Amendment are protected to the same extent as rights guaranteed convicted prisoners under the Eighth Amendment; a constitutional violation in support of a § 1983 claim cannot be established absent a showing of deliberate indifference on the part of the defendant toward the due process rights of the pretrial detainee; mere negligence does not amount to deliberate indifference.

2. GOVERNMENTAL IMMUNITY — CONFINEMENT OF PRETRIAL DETAINEES — FAILURE TO MONITOR.

Failure to follow established policies or security procedures with regard to confinement of a pretrial detainee are ministerial-operational actions to which governmental immunity does not apply.

3. NEGLIGENCE — COMPARATIVE FAULT — JAIL SUICIDES.

In a negligence action resulting from a jail suicide, an instruction regarding comparative fault is necessary to apportion damages between the decedent and the jailer.

*Church, Kritselis, Wyble & Robinson, P.C.* (by *J. Richard Robinson* and *James T. Heos*), for the plaintiff.

*Paskin, Nagi & Baxter, P.C.* (by *Jeannette A. Paskin*), for the defendants.

Amici Curiae:

*Plunkett & Cooney, P.C.* (by *Christine D. Oldani*), for Michigan Municipal League.

ON RESUBMISSION

BRICKLEY, J. The plaintiff brought these two actions after his son committed suicide in a Michigan State University Department of Public Safety holding cell. In the first action, the plaintiff sued officers Linda Zezulka, Richard Bernitt and Ferman Badgley, and the three corporations involved in the original construction of the MSU Department of Public Safety building. In the second action, the plaintiff sued Michigan State University in the Court of Claims. On August 4, 1983, the parties agreed to consolidate the two cases into one proceeding. Eventually, the corporate defendants were voluntarily dismissed from the circuit court action, and defendants Bernitt and Badgley were found not liable by a jury. The plaintiff has not appealed any issues related to these defendants. The jury returned a verdict for the plaintiff against Zezulka and the Court of Claims against MSU. Both actions were upheld by the Court of Appeals.

We must determine if a plaintiff can maintain a claim against a governmental entity and its officers for a pretrial detainee's suicide under either state law or 42 USC 1983. While this Court's order granting leave to appeal specified eight issues for consideration, only four need resolution:

1) Whether the public building exception, MCL 691.1406; MSA 3.996(106), to governmental immunity is applicable to the claims against Michigan State University;

2) Whether the plaintiff presented sufficient evidence of deliberate indifference to support a claim under 42 USC 1983 that Zezulka violated Hickey's civil rights;

3) Whether, relative to plaintiff's negligence claims, Zezulka's actions were discretionary-

decisional, affording her the protection of state governmental immunity under *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984); and

4) Whether, relative to the plaintiff's negligence claims, the trial court erred when it failed to give Zezulka's requested standard jury instruction on comparative negligence and a requested instruction on intervening cause.

We hold that the plaintiff's claim against MSU is barred by state governmental immunity. In so holding, we find that the public building exception, MCL 691.1406; MSA 3.996(106), is inapplicable to this case. We also hold that the plaintiff presented insufficient evidence of deliberate indifference to support a claim under § 1983 and we reverse the trial court's denial of judgment notwithstanding the verdict on the civil rights claim. Further, we find that Zezulka's actions were ministerial-operational and do not afford her the protection of state governmental immunity, and that the trial court correctly refused to instruct the jury on intervening cause. Finally, the signers of this opinion would hold that the trial court also correctly refused to give an instruction on comparative fault.

We therefore reverse the decisions of the Court of Claims and the Court of Appeals applicable to MSU. We reverse the decisions of the circuit court and the Court of Appeals with regard to the plaintiff's § 1983 claim against Zezulka and direct entry of judgment for the defendant on that claim. Because a majority of the Court has found error in the failure to instruct on comparative fault, we reverse the decisions of the circuit court and the Court of Appeals with regard to the plaintiff's negligence claim and remand for a new trial limited to the issue of the plaintiff's damages.

I. FACTS AND PROCEDURAL HISTORY

On October 3, 1982, between 1:00 A.M. and 2:00 A.M., Hickey was observed driving erratically on Harrison Road in East Lansing, Michigan. Zezulka, an officer of the MSU Department of Public Safety (DPS), stopped Hickey, administered a number of field sobriety tests, and eventually placed him under arrest for driving under the influence of intoxicating liquor, MCL 257.625a; MSA 9.2325(1). Zezulka then transported Hickey to the East Lansing Police Department (ELPD) for Breathalyzer tests. Both Zezulka and ELPD Sergeant Louis Muhn observed that Hickey appeared to be in a good mood and appeared to have a generally positive demeanor. While at the ELPD, Sergeant Muhn asked Hickey for some general background information, which was necessary for the Breathalyzer tests, and observed Hickey for at least twenty minutes prior to Zezulka's departure with Hickey.

Zezulka then requested that she be allowed to transport Hickey to the Ingham County Jail. However, Zezulka's superior denied the request because he was concerned about manpower shortages while she was gone. Zezulka complied with her superior's order and took Hickey to the DPS for processing and photographing. After processing Hickey, Zezulka placed him in a holding cell at about 3:20 A.M. Zezulka did not remove any of Hickey's personal articles or clothing, including his belt, even though the DPS had a written policy to remove personal articles from prisoners. The policy stated:

> No prisoner shall be left unattended unless he is first searched and secured in a segregation room. All offensive and defensive weapons or *other objects which could harm an officer, the prisoner or*

*other prisoners shall be removed* and properly
secured. [Emphasis added.]

However, Zezulka did advise Hickey that he would
soon be taken to the Ingham County Jail.

The Court of Appeals described the holding cell
in which Zezulka placed Hickey as "a nine to ten
foot high ceiling and a concrete bench along one
side. Above the [stone] bench was a heater with a
metal mesh that was supported by four metal
brackets which extended one to two inches from
the wall," 177 Mich App 606, 610; 443 NW2d 180
(1989), and ran along the upper portion of the
wall. The door to the holding cell was solid metal
and had a 10 × 10 inch window that officers used
to view any detainees. A desk officer monitored
any sounds coming from the area through a micro-
phone located in the cell.

After placing Hickey in the holding cell, Zezulka
went about her other duties. Although the DPS also
had a policy stating that the officer who brings a
detainee into the department is responsible to
check on the detainee, Zezulka did not check on
Hickey until she went to take him to the Ingham
County Jail at 3:57 A.M., approximately thirty-
seven minutes after she initially placed him in the
holding cell.

Upon entering the cell, Zezulka saw Hickey
hanging by a noose fashioned from his belt and
socks. Hickey had hanged himself from one of the
four metal brackets that attached the heating unit
to the wall. Despite efforts to revive Hickey, he
was pronounced dead on arrival at Sparrow Hospi-
tal in Lansing, Michigan.

On November 1, 1982, John Joseph Hickey, Sr.,
filed a complaint in the Ingham Circuit Court as
the personal representative of the John Joseph
Hickey, Jr., estate against Zezulka and the other

defendants. For the purposes of this appeal, the plaintiff's complaint alleged negligence, gross negligence, and intentional and grossly negligent acts in violation of Hickey's civil rights under 42 USC 1983. On June 9, 1983, the plaintiff also commenced a lawsuit in the Court of Claims against MSU, claiming that the holding cell where Hickey hanged himself was in a dangerous or defective condition and that MSU violated Hickey's civil rights.

MSU and Zezulka filed answers and amended answers to the plaintiff's complaint, claiming state governmental immunity as a defense. However, Zezulka's pleading did not include an affirmative defense of qualified immunity to the plaintiff's 42 USC 1983 claim. Zezulka did not allege that defense until filing a subsequent motion for summary disposition.

In an opinion dated May 10, 1985, the trial court held that Hickey had sufficiently pleaded a cause of action under the public building exception, MCL 691.1406; MSA 3.996(106), to avoid MSU's governmental immunity. The trial court also held that Zezulka's failure to remove Hickey's belt was a ministerial act not entitled to lower-level governmental immunity under *Ross, supra.* Finally, the trial court held that although no valid claim existed under the Eighth Amendment of the United States Constitution against MSU or the individual defendants, a claim under 42 USC 1983 for violating Hickey's Fourteenth Amendment rights had been sufficiently pleaded against Zezulka. The trial court did not discuss Zezulka's claims of qualified immunity.

The claims against Zezulka and the other individual defendants were tried by a jury. During the trial, witnesses gave testimony about suicides, the effects of intoxication, and the effect of isolating

drunken and suicidal individuals. One expert testi-
fied that intoxicated persons normally do not look
depressed because they do not care about the
things that originally depressed them. Other ex-
perts testified that they did not expect any officer
to be able to ascertain if a person is suicidal. The
testimony also indicated that Hickey died after
only a few minutes in the holding cell. At the close
of the plaintiff's proofs, the defendants moved for
a directed verdict arguing, inter alia, that the
plaintiff had failed to present any evidence of
deliberate indifference to Hickey's civil rights.

At the end of the trial, the trial court gave
instructions to the jury. On the plaintiff's civil
rights claim, the trial court stated:

> The essential element which must be present as
> a threshold consideration to support a 1983 action
> in this case is that the intentional *or negligent
> conduct* of Defendants . . . must have deprived
> the complainant of rights . . . . [Emphasis added.]

Defendants' counsel did not object to this instruc-
tion. However, defense counsel did object to the
trial court's refusal to give the requested standard
jury instruction on comparative negligence and a
requested instruction on intervening cause as they
applied to the plaintiff's negligence claim. In re-
sponse, the trial court stated that it believed the
requested instructions were "conceptually not pos-
sible" because they would destroy the plaintiff's
cause of action.

The jury found that Zezulka was negligent and
violated Hickey's civil rights, but that defendants
Badgley and Bernitt were only negligent and did
not violate Hickey's civil rights. The jury then
found that only Zezulka's "negligence and/or vio-
lation of . . . Hickey's civil rights" was a proxi-

mate cause of Hickey's death. The jury awarded
the plaintiff a verdict of $1 million against Ze-
zulka. After the trial, Zezulka's counsel made a
number of postjudgment motions, including a mo-
tion for judgment notwithstanding the verdict ar-
guing, inter alia, that the plaintiff presented insuf-
ficient evidence of deliberate indifference, which
were all denied by the trial court. In its review of
the jury instructions, the trial court noted that
during the course of trial:

> I compare jury instructions. One of my notes to
> myself was that *deliberate indifference was lack-
> ing*; and when Counsel for the Defendant and
> Counsel for the Plaintiff came in with their pro-
> posed instructions, they had agreed on that
> instruction. . . . I do not interject myself when
> counsel agree on instructions. *It doesn't matter
> what I think what the law may be.* If counsel want
> to agree, that's up to them. [Emphasis added.]

In December 1985, the Court of Claims heard
the plaintiff's case against MSU. The Court of
Claims found that the DPS holding cell was in a
dangerous or defective condition because it was
not constructed as a detoxification cell. The court
then awarded the plaintiff $650,000 on the basis of
its findings. The Court of Appeals upheld this
award, as well as the jury verdict against defen-
dant Zezulka.

The Court of Appeals first determined that the
Court of Claims did not err in finding that the DPS
building was a proximate cause of decedent's
death. 177 Mich App 613-614. The Court of Ap-
peals distinguished *Reardon v Dep't of Mental
Health,* 430 Mich 398; 424 NW2d 248 (1988), by
noting that this case did not involve any third
party intervention as did *Reardon.* 177 Mich App
614. The Court of Appeals also found that Zezulka

was not entitled to state governmental immunity because her actions were ministerial-operational and "entail[ed] only minor decision-making . . . ." *Id.* at 615. The Court of Appeals then held that Zezulka waived her qualified immunity defense to the plaintiff's § 1983 claim because she failed to plead it as an affirmative defense. *Id.* at 616.

The Court of Appeals also found that the circuit court did not commit error in the jury instructions that were given or refused. The Court held that Zezulka waived her appeal of the § 1983 instruction because she failed to object to it at trial. *Id.* The Court held that Hickey committed an intentional, not negligent, act so comparative negligence could not be applied. *Id.* at 617. Finally, the Court concluded that because Hickey's suicide was foreseeable, the trial court did not err when it refused to give an instruction on intervening cause. *Id.* at 617-618.

From this decision, defendants MSU and Zezulka appealed. On July 10, 1990, we granted leave to appeal. 435 Mich 861. On September 27, 1991, we ordered reargument and supplemental briefing limited to the issues regarding the trial court's refusal to instruct with regard to comparative negligence and superseding, intervening cause. 438 Mich 1202. We directed the parties to address whether a jury may be asked to compare varying degrees of fault where defendant claims plaintiff's act was intentional and plaintiff claims defendant's act was negligent.

We further ordered that Justice MALLETT would participate in the decision of this case on resubmission.

## II. PUBLIC BUILDING EXCEPTION

### A

A governmental agency is immune from tort

liability for actions undertaken while performing governmental functions. MCL 691.1407; MSA 3.996(107). Although very broad, this immunity is subject to a limited number of narrowly drawn exceptions, *Ross, supra* at 618, including the public building exception, MCL 691.1406; MSA 3.996(106):

Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage *resulting from a dangerous or defective condition of a public building* if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition. [Emphasis added.]

To apply the public building exception, the plaintiff must prove that 1) a governmental agency is involved, 2) the public building in question is open for use by members of the public, 3) a dangerous or defective condition of the public building itself exists, 4) the governmental agency had actual or constructive knowledge of the alleged defect, and 5) the governmental agency failed to remedy the alleged defective condition after a reasonable period of time. *Williamson v Dep't of Mental Health,* 176 Mich App 752, 760; 440 NW2d 97 (1989); *Ransburg v Wayne Co,* 170 Mich App 358; 427 NW2d 906 (1988). However, the only question before us is whether a dangerous or defective condition existed in the DPS holding cell.

In general, governmental agencies "are subject to liability for a dangerous or defective condition of a public building without regard to whether it

arises out of a failure to repair and maintain."
*Bush v Oscoda Area Schools,* 405 Mich 716, 730;
275 NW2d 268 (1979). A public building may be
dangerous or defective because of improper design,
faulty construction, or absence of safety devices.
*Id.* However, a court should only look to the uses
or activities for which the public building is as-
signed to determine if a dangerous or defective
condition exists. *Id.* at 731. Clearly, the question is
not only whether the physical condition caused the
injury incurred, but also whether the physical
condition was dangerous or defective under the
circumstances presented. *Reardon,* 430 Mich 410-
411.

In *Reardon* we held that "the duty imposed by
the public building exception relates to dangers
actually presented by the building itself. To hold
otherwise would expand the exception beyond the
scope intended by the Legislature when it enacted
the immunity act." *Id.* at 415. We also found that
the purpose of the public building exception was to
promote the maintenance of safe public buildings,
"not necessarily safety in public buildings." *Id.* In
*Schafer v Ethridge,* a companion case to *Reardon,*
we held that where proper supervision would have
"offset any shortcomings in the configuration of
the room," the public building exception does not
apply. *Id.* at 417.

B

The plaintiff made three principal arguments
throughout the course of trial to avoid MSU's gov-
ernmental immunity defense. First, the plaintiff
claimed that the holding cell's design and struc-
ture was a dangerous or defective condition. Sec-
ond, the plaintiff argued that the lack of a detoxifi-
cation cell and state-of-the-art equipment in the

DPS were sufficient evidence to show a dangerous or defective condition. Third, the plaintiff argued that the placement of the heating unit and the metal brackets were dangerous or defective conditions that proximately caused Hickey's death.

1

The plaintiff alleged that the building's improper design prevented proper supervision and allowed the public building exception to be applied.[1] *de Sanchez v Genoves-Andrews (On Remand),* 179 Mich App 661; 446 NW2d 538 (1989). Although we agree that a claim of improper design may allow the public building exception to be applied, that outcome is not required here.

In *de Sanchez,* the Court of Appeals found that a dangerous condition existed because a holding cell specifically assigned for potentially suicidal patients in a mental hospital had dividing bars over the bathroom stalls. *Id.* at 668-669. However, the Court of Appeals also noted that "[t]he relationship between the inadequacy of the rest room structure for staff observance of patients' activities within the rest room and the decedent's suicide *is too tenuous to permit recovery* under *Reardon* . . . ." *Id.* (Emphasis added.) Similarly, just because the DPS building was designed so that a detainee's activities could not be observed *at all times* does not automatically allow recovery under the public building exception to be applied. The plaintiff here attempted to argue that the failure to have the holding cell in view of the guard

---

[1] If the plaintiff had specifically argued that a lack of supervision allowed the public building exception to apply, as was suggested several times during the trial, his claim would fail. The failure to supervise clearly implicates the conduct of individuals, not any danger presented by the physical condition of a public building, and would be barred by *Reardon* and *Bush, supra.*

station was a defective condition. As in *Reardon,* however, more effective supervision would have overcome this alleged design defect in the holding cell. Therefore, a claim based on the inability to observe Hickey because of the structural design of the DPS is an insufficient basis on which to apply the public building exception. Before a claim under a building design defect can support invoking the immunity exception, such a design must more directly cause the injury at issue.

2

The plaintiff's claim that MSU should have a detoxification cell and state-of-the-art equipment is also controlled by *Reardon.* In *Reardon,* we held that an area not "configured in the most modern design possible at the time" is not necessarily in a dangerous or defective condition. *Id.* at 417. During the trial, numerous witnesses testified about the appropriate designs, structures, and equipment necessary for a holding facility to care for intoxicated persons. The witnesses testified that under some circumstances, a holding facility should have a special detoxification cell for housing intoxicated persons. However, the only fact that was clearly established by all the testimony was that if the DPS building had been up-to-date and had used state-of-the-art technology, Hickey's suicide may have been detected earlier and possibly prevented. Under *Reardon,* proving that the MSU facility was not up-to-date or using the most modern designs possible is insufficient. Therefore, the plaintiff cannot avoid MSU's governmental immunity defense by suggesting that state-of-the-art designs and technology were necessary.[2]

_____

[2] The Court of Appeals relied on *Davis v Detroit,* 149 Mich App 249; 386 NW2d 169 (1986), which stated that the lack of a detoxification

3

The plaintiff also alleged during trial that the heating unit and the metal brackets were dangerous or defective because they were improperly placed even for a normal jail cell. In addition to the evidence about the design and structure of the holding cell in which Hickey committed suicide, the evidence presented showed that this holding cell was designated in the prisoner processing guidelines as one of the three rooms in which detainees should be held prior to transfer to a local jail. Additional evidence indicated that MSU officers had used all of the holding cells to segregate detainees prior to transfer to the county jail since the mid-1970s, that the holding cells were never used for permanent detention, and that no one had ever been held in the DPS building for more than a few hours before being transferred to another facility. The testimony at trial also indicated that no one prior to Hickey ever attempted suicide in any of the holding cells in the DPS building.

We find that our opinion in *Bush* resolves this allegation. In *Bush,* we concluded that whether a given room, in this case a cell, is dangerous or defective must be determined in light of the uses or activities for which it is specifically assigned. *Id.* at 731. In *that case we held that a nonlaboratory* classroom used for laboratory activities was dangerous or defective. *Id.* We focused on the fact that the classroom did not meet the requirements of a laboratory classroom, the specific use to which it was assigned at the time of the accident. *Id.* at 732.

MSU's holding cell was specifically intended and

cell created a defective and dangerous condition allowing application of the public building exception. Because *Davis* was decided prior to *Reardon,* it is of questionable authority.

assigned for temporary detention. Even the plaintiff did not argue that the cell was used for any purpose except the temporary lockup of arrestees. We must, therefore, determine if this cell, with the installation of the heating unit, specifically used and assigned for temporary detention, was dangerous or defective. We hold that it was not.

The experts testifying at trial, in addition to discussing whether a detoxification cell would have been more appropriate for holding Hickey, also reviewed whether any jail or holding cell could be "suicide proof." The record indicates that even though the experts disagreed on many issues, they conceded, if questioned, that no jail or holding cell could be suicide proof. Some of the testimony indicated that even a detoxification cell was not suicide proof. We find this testimony to be conclusive.

This particular cell had a combination sink and toilet, a water faucet and a towel bar/handle that could possibly provide an anchor for a similar suicide attempt. There would seem to be no limits on the possibility of suicide in an ordinary lock-up cell, particularly one that was only being used for temporary custody, even the temporary custody of an inebriated individual. To suggest that any physical feature of a jail cell, otherwise benign, that can conceivably become a part of a plan of one who is desperately driven to self destruction can become a "dangerous or defective condition" under the public building exception statute, simply crosses the outer limits of any reasonable reading of the intent of that statute when considered in the context of its history, purpose, and wording.

If MSU should have had a cell intended to be suicide proof, or if this suicide victim should have been confined in such a cell, those "should haves"

may well have amounted to negligence, see, e.g., *Molton v City of Cleveland,* 839 F2d 240, 246 (CA 6, 1988) (the failure to build a suicide-proof cell only proves mere negligence), but they do not convert the heating unit and metal brackets in question into a dangerous and defective condition given the normal uses and purposes for which the cell was designed and assigned. At most, the plaintiff's claim relates to safety *in* the public building, including any possible duty that the officers had to protect Hickey from harming himself. However, Hickey's unfortunate death does not relate to the maintenance of a safe public building for the specific use and purpose for which it was assigned.

Therefore, the DPS temporary holding cell, the heating unit, and the metal brackets were not a dangerous or defective condition under the public building exception. MSU is entitled to immunity under the governmental tort liability act, MCL 691.1407; MSA 3.996(107), and the plaintiff's claim is barred.

### III. 42 USC 1983

We must resolve only one issue related to the plaintiff's claim against Zezulka under 42 USC 1983: whether the plaintiff presented sufficient evidence of deliberate indifference to Hickey's civil rights. If a defendant bases its motion for judgment notwithstanding the verdict on the insufficiency of the evidence as a matter of law to support the claim, a failure to object to an erroneous jury instruction does not prevent entry of judgment for the defendant. See *Boyle v United Technologies Corp,* 487 US 500, 513-514; 108 S Ct 2510; 101 L Ed 2d 442 (1988); *City of St Louis v Praprotnik,* 485 US 112, 118-121; 108 S Ct 915; 99

L Ed 2d 107 (1988). See also 9 Wright & Miller, Federal Practice & Procedure, § 2537, pp 599-600.[3]

In *York v Detroit (After Remand),* 438 Mich 744; 475 NW2d 346 (1991), we adopted the prevailing federal rule that a pretrial detainee's due process rights under the Fourteenth Amendment are protected to the same extent as the rights guaranteed convicted prisoners under the Eighth Amendment. Thus, the plaintiff could not establish a constitutional violation in support of a § 1983 claim absent a showing of deliberate indifference, and mere negligence does not amount to deliberate indifference. *Id.* at 759.[4] This, then, takes us to the question whether the evidence supports a finding that any of Zezulka's acts or omissions constituted deliberate indifference toward Hickey's civil rights as a pretrial detainee.

The plaintiff alleged that Zezulka breached her duty of care and violated Hickey's civil rights by failing to remove Hickey's belt before he was placed in the DPS holding cell and by failing to properly monitor him while he was in the cell. We conclude that such omissions on the part of Zezulka do not amount to deliberate indifference. We find the circumstances in *Edwards v Gilbert,* 867 F2d 1271 (CA 11, 1989), analogous and the court's

---

[3] In view of our holding regarding the insufficiency of the evidence of deliberate indifference, we need not deal with Zezulka's claim that she is entitled to qualified immunity despite having failed to properly plead that affirmative defense. With regard to the jury instruction given by the trial court, it necessarily follows from our holding today that a proper instruction must incorporate a deliberate indifference standard of liability.

[4] The federal circuit courts have applied the deliberate indifference standard to due process claims in a number of jail suicide cases. These courts have found that the negligent failure to prevent a suicide is an insufficient basis upon which to rest a Fourteenth Amendment due process claim under 42 USC 1983. *Molton v City of Cleveland, supra; Partridge v Two Unknown Police Officers of the City of Houston,* 791 F2d 1182, 1187 (CA 5, 1986); *Roberts v City of Troy,* 773 F2d 720 (CA 6, 1985); *State Bank of St Charles v Camic,* 712 F2d 1140, 1146 (CA 7, 1983).

reasoning in that case especially persuasive. In *Edwards,* a juvenile convicted of sexual assault was held in a county jail to await sentencing. The juvenile committed suicide by hanging himself with a bedsheet. The evidence at trial showed that the guards checked the juvenile every fifteen minutes, but that this procedure did not prevent his suicide. The *Edwards* court analyzed the plaintiff's due process claim, stating:

> Invocation of fourteenth amendment substantive due process also adds nothing to plaintiff's case [because] "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons."
> In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, *under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed "deliberate indifference" to the prisoner's taking of his own life.* See *Whitley v Albers,* 475 US [312, 327; 106 S Ct 1078; 89 L Ed 2d 215 (1986)]; *State Bank of St Charles v Camic,* 712 F2d 1140, 1146 (CA 7, 1983). [*Id.* at 1274-1275. Emphasis added; citation omitted.]

In *Edwards,* the court held that the defendants' acts did not constitute deliberate indifference to a potential suicide by the prisoner where no suicide had been attempted or threatened. *Id.* at 1276. The court stated:

> In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference. [*Id.* at 1275.]

In this case, there was no evidence presented that Hickey threatened to commit suicide or attempted suicide before being placed in the holding cell by Zezulka. Nor was there any testimony, other than the fact that Hickey was intoxicated, that he behaved in such a manner as to put Zezulka on notice that he was likely to commit suicide.

The *Edwards* court also rejected the plaintiff's argument that the defendants were deliberately indifferent because they violated certain state laws and regulations regarding housing of juveniles in adult jails. *Id.* at 1276. The court noted that the United States Supreme Court has held that officials do not lose their qualified immunity when sued under § 1983 merely because their conduct violates a statutory or administrative provision. *Davis v Scherer,* 468 US 183, 194; 104 S Ct 3012; 82 L Ed 2d 139 (1984). Another federal court has also rejected the argument that failure to follow established procedures constitutes deliberate indifference sufficient to support a § 1983 claim. In *State Bank of St Charles v Camic,* 712 F2d 1146, the court held:

> Even if the defendants disregarded one or more of their established procedures, such as checking the cells every hour . . . , the actions of the defendants do not constitute deliberate disregard

because the defendants had no actual knowledge that the detainee was a suicide risk. We agree. The plaintiff's allegation that Zezulka violated certain mandatory DPS regulations does not rise to the level of deliberate indifference, the state-of-mind required to sustain an action under § 1983 for a violation of a pretrial detainee's civil rights.

Therefore, we conclude that the plaintiff has presented insufficient evidence of deliberate indif-

ference on the basis of the acts or omissions of
defendant Zezulka. At the close of the plaintiff's
proofs, the defendants moved for a directed ver-
dict, arguing that the plaintiff presented no evi-
dence of deliberate indifference. Subsequent to the
entry of the judgment in this case, Zezulka re-
newed this argument in her motion for judgment
notwithstanding the verdict. Because the plaintiff
has presented insufficient evidence to support a
claim under 42 USC 1983, we reverse the trial
court's denial of Zezulka's motion for judgment
notwithstanding the verdict on this claim and
direct entry of judgment for defendant.

### IV. STATE GOVERNMENTAL IMMUNITY

#### A

We now turn to the plaintiff's state law claims
against defendant Zezulka. We must initially de-
termine whether Zezulka is entitled to state gov-
ernmental immunity.[5] To be entitled to that immu-
nity, Zezulka must show that she was:

> 1) acting during the course of [her] employment
> and acting, or reasonably believe[d] [she was] act-
> ing, within the scope of [her] authority;
> 2) acting in good faith; and
> 3) performing discretionary, as opposed to minis-
> terial acts. [*Ross, supra* at 633-634. Citations omit-
> ted.]

Although both parties agree that Zezulka satisfied
the first two prongs of the state governmental
immunity test, the parties argued extensively over

[5] As in *Green v Berrien General Hosp Auxiliary, Inc*, 437 Mich 1;
464 NW2d 703 (1990), this case must be decided on the basis of the
law as it existed before the Legislature's amendments of the govern-
mental tort liability act, MCL 691.1401-691.1413; MSA 3.996(101)-
3.996(113), in 1986. 1986 PA 175.

whether Zezulka was performing a discretionary-decisional act.

We note that the inquiries of immunity and negligence cannot be confused. *Canon v Thumudo,* 430 Mich 326; 422 NW2d 688 (1988). "[T]he relevant inquiry is not whether the specific act complained of was negligent, but whether it was discretionary-decisional in nature." *Id.* at 350.

In *Ross, supra* at 634-635, we decided that activities requiring personal deliberation, decision, and judgment are discretionary-decisional actions. However, acts requiring mere obedience to orders or performance of duties in which the individual had little or no choice are ministerial-operational activities. We also stated that the difference between discretionary-decisional acts and ministerial-operational acts was a difference between deciding to engage in an activity and the actual performance of that activity. We clarified this analysis in *Green, supra* at 12-13, when we stated that conduct involving routine administrative tasks or minor decision making, but not requiring the exercise of significant decision making, will be considered ministerial-operational in nature. Finally, we have also held that the failure to follow established policies or the failure to follow established security procedures are ministerial-operational actions to which governmental immunity would not apply. *Ross, supra* at 651; *Bandfield v Wood,* 421 Mich 774; 364 NW2d 280 (1985).

With this background in mind, we undertake a factual analysis of the conduct at issue to determine whether Zezulka should be entitled to state governmental immunity. *Green, supra* at 9-10.

B

The plaintiff challenged Zezulka's claim of state

governmental immunity on two grounds. First, the plaintiff argued that the failure to remove Hickey's belt when he was put into the DPS holding cell was a ministerial-operational activity. Second, the plaintiff argued that the failure to properly monitor Hickey once he was lodged in the holding cell was also a ministerial-operational action barring Zezulka's state governmental immunity claim.

1

MSU's prisoner processing guidelines require the removal of all harmful objects from any detainees. The testimony about the removal of harmful objects showed that although the guidelines were not considered mandatory when they were written, the senior DPS officers considered removing a detainee's belt to be a mandatory requirement. These officers believed that the policy mandated the removal of all objects that could be harmful to the prisoner. These officers and additional experts also testified that a detainee's belt is always harmful. However, other testimony, including statements by Zezulka, indicated that the DPS guidelines were not specific directives, did not always require removal of a detainee's belt, and should be based on the officer's discretion.

Although not every deviation from an established policy or rule will be considered a ministerial-operational action, *Canon, supra* at 350, the preparation of a detainee for holding was a ministerial-operational task that bars Zezulka's claim of immunity. Similar to the nurse's activities in *Green, supra,* the removal of harmful objects from a detainee was a routine practice that required only limited decision making. Furthermore, Zezulka was not deciding to engage in an activity, but was performing an activity under an estab-

lished policy. *Ross, supra* at 635. Therefore, we find that Zezulka's actions in preparing Hickey for confinement were ministerial-operational activities not entitled to state governmental immunity.

2

Zezulka's alleged failure to properly monitor Hickey once he was put into the holding cell is also a ministerial-operational act that bars her state governmental immunity claim.[6] In *Willis v Dep't of Social Services* and *Regulski v Murphy,* companion cases to *Ross,* we held that the failure to supervise children during the course of recreation and classroom activities was a ministerial-operational activity not entitled to the protections of governmental immunity. *Ross, supra* at 640, 651. See *Bandfield, supra.* Our focus in these two cases was clearly on the visual monitoring of the children involved and not on the broader aspects denoted by the term "supervision." *The Random House Dictionary of the English Language: Unabridged Edition,* p 1911.

If the actions in *Willis, Regulski* and *Bandfield* were considered ministerial-operational in nature, clearly the failure to monitor Hickey once he was put in holding was a ministerial-operational activity that avoids Zezulka's claim of governmental immunity. The testimony at trial indicated that the MSU officer who brought in a detainee had the responsibility to properly monitor the detainee during detention. As with the failure to remove Hickey's belt, Zezulka was applying an established

[6] If the plaintiff had claimed that Zezulka failed to evaluate Hickey as suicidal, that claim would fail. Under *Canon, supra* at 338, the failure to evaluate Hickey as suicidal must be considered a discretionary-decisional action that would be entitled to governmental immunity. However, that is not the claim here. Instead, the plaintiff's second claim rests on Zezulka's failure to properly supervise Hickey.

policy that only required minor decision making. Therefore, any failure to monitor Hickey once he was put into the holding cell was a ministerial-operational act which bars Zezulka's claim to governmental immunity.

## V. JURY INSTRUCTIONS

Now that we have determined that Zezulka has no state governmental immunity defense to the plaintiff's negligence claims, we must decide whether the trial court should have given Zezulka's requested standard jury instructions on comparative negligence, SJI2d 11.01, and an instruction on intervening cause.

Zezulka timely requested the comparative negligence and intervening cause instructions, but the trial court refused to give them. The trial court found that the standard jury instructions on comparative negligence and the requested instruction on intervening cause would destroy any cause of action for wrongful death based on a jail suicide.

### A

The defendant states that there is no record of the specifically requested instruction on the issue of intervening cause; therefore, we look first to the standard jury instructions to determine whether such an instruction would be appropriate in this case. The standard instructions do not include an instruction that would allow a jury to find that conduct by the plaintiff himself was an intervening, superseding cause of the plaintiff's harm, to the extent that the defendant, though negligent, is relieved from liability. See SJI2d 15.05 and 15.06. The note on use accompanying SJI2d 15.05 states that the instruction should be used only when

there is evidence that the sole proximate cause of plaintiff's harm may have been the conduct of a *third person.* The note on use accompanying SJI2d 15.06 makes a similar recommendation, limiting the use of that instruction to cases where there is evidence that an *outside force* may have been the sole proximate cause of the plaintiff's injury. While neither of these standard jury instructions would have been appropriate on the facts of this case, we must decide whether the trial court should have crafted its own instruction with regard to intervening cause.

Like the standard instructions, most of the cases reviewing the applicability of an intervening cause jury instruction are concerned with the intervention of a third party or outside force. See, e.g., *Parks v Starks,* 342 Mich 443; 70 NW2d 805 (1955); *Johnston v Harris,* 387 Mich 569, 574-575; 198 NW2d 409 (1972) (intentional acts of a third party can be superseding events that bar the defendant's liability). While there is some support for the theory that the conduct of the plaintiff may also be a superseding cause of the plaintiff's injury, see 57A Am Jur 2d, Negligence, § 650, p 607, we are not persuaded that in this case an instruction with regard to intervening cause was appropriate.[7]

A superseding cause is one that intervenes to prevent a defendant from being liable for harm to a plaintiff that the defendant's antecedent negligence is a substantial factor in bringing about. See

[7] A prisoner suicide presents a unique situation where the state has voluntarily taken complete and total control of the plaintiff's actions and well-being. Because of this unique nature, we limit our holding to similar jail- or incarceration-type situations. Therefore, we do not decide whether a plaintiff's intentional conduct could be a superseding cause of the plaintiff's injury in other situations not similar to the facts of this case.

2 Restatement Torts, 2d, § 440, p 465.[8] We have previously held that in order to be a superseding cause, thereby relieving a negligent defendant from liability, an intervening force must not have been reasonably foreseeable. *Davis v Thornton*, 384 Mich 138, 148; 180 NW2d 11 (1970); *Comstock v General Motors Corp*, 358 Mich 163, 178-180; 99 NW2d 627 (1959).

While a defendant will not be liable for injury caused by an intervening force that was not reasonably foreseeable,

> [i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby. [2 Restatement Torts, 2d, § 449, p 482.]

This statement has also been made with regard to the acts of a *plaintiff* in relation to a defendant's negligence:

> Generally, where the defendant's negligence has created a stimulus for the plaintiff's act there is no break in the chain of events which would prevent the negligent defendant's liability. [57A Am Jur 2d, Negligence, § 650, p 607.]

This is so because, "[i]f the acts of the plaintiff are within the ambit of the hazards covered by the duty imposed upon the defendant, they are foreseeable and do not supersede the defendant's negli-

---

[8] We have often cited with approval the sections of the Restatement dealing with superseding cause. See, e.g., *Johnston v Harris, supra; Sweet v Ringwelski*, 362 Mich 138; 106 NW2d 742 (1961); *Comstock v General Motors Corp*, 358 Mich 163; 99 NW2d 627 (1959). We find these sections instructive on this issue not previously decided by this Court.

gence." *Id.* at § 652, p 609. Thus, where the defendant's negligence consists in enhancing the likelihood that the intervening cause will occur, *Johnston v Harris, supra* at 573, or consists in a failure to protect the plaintiff against the very risk that occurs, Prosser & Keeton, Torts (5th ed), § 44, p 303, it cannot be said that the intervening cause was not reasonably foreseeable.

In *Moning v Alfono,* 400 Mich 425, 441; 254 NW2d 759 (1977), we made a similar finding, quoting Prosser, *supra:*

> "If the intervening cause is one which in ordinary human experience is reasonably to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances, he may be negligent, among other reasons, because he has failed to guard against it; or he may be negligent only for that reason."

Thus, in *Moning,* we found that by marketing slingshots directly to children, the defendants had created the risk that a child would use the slingshot, and we concluded that the defendants could not be relieved from liability by the fact that the risk to which they subjected the plaintiff had indeed come to pass.

In this case, Zezulka owed Hickey a duty of ordinary care for his safety, requiring her to use reasonable care under the circumstances. Generally, a person is under no duty to aid or protect another individual; however, a special relationship between the parties may give rise to such a duty. 2 Restatement Torts, 2d, § 314A, p 118. The custodial relationship between the DPS and Hickey is such a special relationship that gives rise to the duty to give aid and protect from harm. *Id.* Zezulka did not challenge on appeal the issue of her

duty toward Hickey; therefore, it is not subject to our review. MCR 7.302(F)(4)(a).

The crux of the plaintiff's case is that Zezulka breached her duty to protect Hickey from harm by failing to act with ordinary care and that her negligence consisted of her failure to remove Hickey's belt and her failure to supervise Hickey while he was in the DPS holding cell. The jury found that Zezulka was negligent. This issue also was not appealed and therefore is not subject to our review. One of the factors in determining whether certain conduct constitutes negligence is an assessment whether the defendant knew or should have known that his conduct was likely to result in harm—"should the defendant have reasonably foreseen that what he was doing or had done up to then might cause harm—if so, he was negligent." *Davis, supra* at 146. In fact, negligence cannot be found to exist "unless an actor, who is under a duty to act, fails to act after he has perceived or should have perceived an *unreasonable* risk of harm to another." *Samson v Saginaw Professional Bldg, Inc,* 393 Mich 393, 406; 224 NW2d 843 (1975).

Therefore, on the facts of this case, a finding by the jury that Zezulka's failure to remove Hickey's belt, and her failure to properly supervise him in the DPS holding cell, constituted negligence would be nonsensical if Hickey's subsequent intentional act of harming himself was not reasonably foreseeable by Zezulka. When a defendant owes a duty of ordinary care to give aid to and to protect an individual from harm because of the special relationship between the parties, and the plaintiff's claim is that the defendant was negligent in failing to prevent or in creating a stimulus for the plaintiff's own act that intervened to cause him harm, it cannot be said that the intervening act is a superseding cause of his injury. Thus, by negli-

gently enhancing the likelihood of Hickey's intervening act of suicide, and by failing to protect Hickey from the very risk she created, Zezulka cannot be relieved from liability because the risk she created actually came to fruition. "A peril produced in part, at least, by defendant's negligence does not excuse the negligence." *Adelsperger v Detroit,* 248 Mich 399, 402; 227 NW 694 (1929).

Therefore, an instruction to the jury that, after finding Zezulka negligent, it could relieve Zezulka of liability for her negligence if it found that Hickey's act of suicide was not reasonably foreseeable, was neither necessary nor appropriate in this case. We agree with the Court of Appeals that the trial court did not err by refusing to give such an instruction. *Hickey, supra* at 617.

B

The signers of this opinion also agree with the Court of Appeals that a comparative negligence instruction is improper in a jail suicide case, *Hickey, supra* at 617. The standard jury instruction requested by Zezulka provides as follows:

> *Plaintiff's negligence,* if any, does not bar a recovery by the plaintiff against the defendant, but the total amount of damages to which the plaintiff would otherwise be entitled shall be reduced by the percentage that *plaintiff's negligence* contributed as a proximate cause to [his/her] [injury/ property damage]. This is known as comparative negligence. [SJI2d 11.01. Emphasis added.]

The note on use accompanying SJI2d 11.01 states that the instruction should be used only where

there is a question for the jury regarding the negligence of the plaintiff. Therefore, this standard instruction would be appropriate in this case only if the evidence showed that Hickey acted negligently in harming himself.

In the case before us, the trial court determined that Hickey's conduct was intentional, rather than negligent, for purposes of applying the standard comparative negligence jury instruction. Therefore, because the standard jury instruction should only be given when the plaintiff's *negligence* is a partial proximate cause of the injuries that occurred, and in this jail suicide case the action taken by the decedent was voluntary and *intentional,* we find that the standard jury instruction regarding comparative negligence was not proper here.

While the trial court did not err by refusing to give the standard jury instruction on comparative negligence, we must consider whether some instruction with regard to comparative fault would have been appropriate. In deciding this issue, we look to prior decisions by this Court for guidance. This Court initially accepted the doctrine of comparative negligence in *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979); see also *Kirby v Larson,* 400 Mich 585; 256 NW2d 400 (1977). Throughout our analysis, although we continuously referred to the application of the comparative "fault" of the parties, *Placek* at 660-662; *Kirby* at 642-645, we also stated that the doctrine only applies when the negligence of the plaintiff became an issue in the case. It is doubtful that we envisioned allowing an apportionment of fault when a plaintiff undertakes a voluntary and intentional activity which causes harm to himself, where a defendant has a duty to protect that

plaintiff from harm, including injury by his own intentional acts.[9]

Zezulka does not dispute that our courts and other jurisdictions do not extend comparative fault analysis to cases where a party acted intentionally in causing harm. Rather than apportioning fault between the parties, one of whom was only negligent and one of whom acted intentionally, courts have placed one hundred percent of the fault on the party whose actions were intentional. Thus, a defendant who intentionally injures a plaintiff is not entitled to mitigation of damages on the basis of the fact that the plaintiff's negligence was also a proximate cause of his injury. See *Vining v Detroit,* 162 Mich App 720, 727; 413 NW2d 486 (1987); *Melendres v Soales,* 105 Mich App 73, 82; 306 NW2d 399 (1981). In *Melendres,* the Court of Appeals reasoned that in such situations the defendant had not been negligent and therefore there were no degrees of negligence to compare. Further, in cases where the plaintiff's injury is caused at least in part by his own intentional act, as in the case of a person who commits suicide, the general rule is that fault is not apportioned between the plaintiff and a negligent defendant, and instead the plaintiff's claim is barred. Schwartz, Comparative Negligence (2d ed), § 5.5, p 110 (using the example of a plaintiff who knowingly and voluntarily steps in front of a defendant's speeding car).

However, as we noted above in section V(A), a jail suicide case presents an exception to the rule that there is no duty to give aid to and protect another person from harm. Therefore, if apportionment of

[9] We note as well that the comment accompanying the standard jury instruction regarding comparative negligence cites *Placek, supra,* indicating that the standard instruction, which we have already said would not be appropriate in this case, is derived from this Court's reasoning and our decision in *Placek.*

fault is not available, a defendant who negligently causes a person's suicide will bear the full burden of the plaintiff's damages, despite the fact that the plaintiff acted intentionally in harming himself. We must determine, then, if an apportionment of fault is appropriate in such a case.

Zezulka has made no argument to this Court in support of her claim that the trial court erred by refusing to give a comparative fault instruction in this case.[10] The plaintiff notes that Zezulka breached her duty to use ordinary care in protecting Hickey from harm, including his own intentional act of harming himself. The plaintiff argues, then, that it would be nonsensical to allow Zezulka to plead in mitigation of damages the very occurrence she negligently failed to prevent. We agree with the plaintiff that apportionment of fault on the basis of the fact that a plaintiff intentionally harmed himself is not appropriate in a jail suicide case.

It has been said that the doctrine of *contributory* negligence "is an expression of the highly individualistic attitude of the common law, and its policy of making the personal interests of each party depend upon his own care and prudence." Prosser, *supra* at § 65, p 452. See also 2 Restatement Torts, 2d, § 463, comment b, p 506. In adopting a system of *comparative* negligence, this Court abandoned only the effect of contributory negligence as a total bar to a plaintiff's recovery, to the extent that a plaintiff's negligent contribution to his own injury would merely reduce his award of damages. *Placek, supra* at 650, n 1. However, a jail suicide presents a situation where a defendant has

---

[10] In fact, our Brother Justice GRIFFIN questioned Zezulka's counsel during oral argument whether she had abandoned her claim that a comparative negligence instruction should have been given, and she responded in the affirmative.

a duty to give aid to and protect another person in the defendant's custody, even from his own intentional acts. Thus, a defendant in a case such as this breaches her duty by negligently failing to prevent another person's violation of the standard of care with respect to his own safety. We hold then, that in a jail suicide case, a negligent defendant cannot plead, in mitigation of damages, the fact that a plaintiff, to whom she owed a duty, violated a standard of care for his own protection.

Further, we note that the conclusion that fault should not be apportioned where a party acted intentionally is based in part on the idea that intentional and voluntary conduct differs from negligence not only in degree, but also in kind. Prosser, *supra* at § 65, p 462. Intentional and voluntary conduct, such as that undertaken by Hickey in this case, is qualitatively different from levels of negligence, and therefore is not capable of intelligent comparison by the courts or by a jury.[11] Furthermore, because there are no degrees of intentional conduct, as there are with negligence,

---

[11] See Prosser, *supra* at § 67, p 478, noting that in some jurisdictions that recognize the law of strict liability in tort, apportionment of damages, on the basis of the plaintiff's negligence, is not available:

A few courts have held the doctrine [of comparative negligence] to be entirely inapplicable to actions for strict products liability, reasoning that to compare a user's fault with the maker's no-fault responsibility is to mix apples with oranges, and that to reduce the user's damages would undermine the strict products liability goal of encouraging manufacturers to anticipate and protect against consumer negligence.

A strict products liability case is analogous to a jail suicide case because in both situations the plaintiff's fault exceeds the defendant's in both degree and kind, and the defendant's duty encompasses the foreseeable violation of the standard of care by the plaintiff. While this Court has not adopted the doctrine of strict products liability, see *Prentis v Yale Mfg Co,* 421 Mich 670; 365 NW2d 176 (1984), we nevertheless find this reasoning persuasive and supportive of our holding here that Zezulka is not entitled to mitigation of damages based on the fault of Hickey in taking his own life.

an attempted comparison would logically lead to a defeat of any claim based on one's negligence that results in a suicide where there is a duty to protect another person from ' harm. We find it difficult, in the situation before us, to envision a jury instruction that would accurately advise a jury on how to apportion fault between these two distinct types of conduct.

Therefore, the signers of this opinion would conclude that the trial court did not err in refusing to give the standard jury instruction regarding comparative negligence, and we would hold that apportionment of fault is not appropriate in a jail suicide case.

### VI. CONCLUSION

We hold that the plaintiff's claims against MSU are barred by governmental immunity. Because the holding cell was not dangerous or defective for the purpose for which it was intended, the public building exception, MCL 691.1406; MSA 3.996(106), is inapplicable and cannot be used to impose liability on MSU. Therefore, the decisions of the Court of Claims and the Court of Appeals are reversed, and this case is remanded to the Court of Claims for entry of a judgment in favor of MSU.

We also hold that, applying the proper deliberate indifference state-of-mind requirement, the plaintiff presented insufficient evidence to support the claim, and we reverse the trial court's denial of Zezulka's motion for judgment notwithstanding the verdict on the § 1983 claim and direct entry of judgment for the defendant.

We agree with the trial court and the Court of Appeals that Zezulka is not protected by state governmental immunity because her alleged improper actions were ministerial-operational in na-

ture. Further, we find that the trial court correctly refused to give a jury instruction regarding inter-vening cause. Finally, the signers of this opinion find no error in the trial court's failure to instruct on comparative fault.

The jury verdict form in this case directed the jury to make separate findings with regard to whether Zezulka was negligent and whether she violated Hickey's civil rights. The jury answered both of these questions in the affirmative. The form next directed that if either of these questions were answered "yes," the jury should then answer a third question: "Was Defendant Linda Zezulka's negligence *and/or* violation of John Joseph Hickey's civil rights a proximate cause of his death?" The jury answered this question "yes." We observe that, even though the verdict left some question whether or not the jury found proximate cause with regard to only one or both of the claims, both the negligence claim and the civil rights claim were based on precisely the same conduct by Zezulka. It therefore would have been illogical for the jury to have found proximate cause on one claim and not the other. Thus, we are compelled to conclude that either claim would support the jury's verdict.

Thus, having concluded that Zezulka should have been granted judgment notwithstanding the verdict on the civil rights claim, we direct entry of judgment for Zezulka on that claim. However, a majority of the Court has found error in the trial court's failure to instruct on comparative fault. Therefore, we reverse the decision of the Court of Appeals with regard to the negligence claim and remand for a new trial pursuant to MCR 2.611(A)(1)(g), which provides:

(A) Grounds.

(1) A new trial may be granted to all or some of

the parties, *on all or some of the issues,* whenever their substantial rights are materially affected, for any of the following reasons:

*     *     *

(g) Error of law occurring in the proceedings, or mistake of fact by the court. [Emphasis added.]

Because the trial court's error in failing to instruct on comparative fault does not affect the jury's finding that Zezulka's negligence was a proximate cause of Hickey's injury, the issues to be determined on the retrial ordered are limited to the amount of damages and comparative fault; the range of appropriate proof within these parameters is for the trial court to determine.

MALLETT, J., concurred with BRICKLEY, J.

LEVIN, J., concurred with BRICKLEY, J., except with regard to the building exception issue.

RILEY, J. While I concur with the analysis of parts II, III, IV, and V(A) of the lead opinion, I disagree with the holding in V(B) that a comparative fault instruction was unnecessary in this case. Considering the finding by the jury that Mr. Hickey's suicide was a foreseeable consequence of Officer Zezulka's negligence in this custodial setting, I agree with the finding that no intervening cause instruction need be given. I believe, however, that a comparative fault instruction should have been given.

As a general rule, a plaintiff may not recover damages in negligence for the intentional suicide

of another.[1] Where a plaintiff intentionally commits an act that brings about an injury, the risk of which was increased by the defendant's negligence, the plaintiff ordinarily loses any cause of action he might have because of defendant's negligence. Where, however, the defendant assumes a duty to protect the plaintiff from that injury, as in this involuntary custody situation, I agree that the plaintiff should not lose his cause of action.[2] I disagree, however, that the other extreme should be adopted—that the defendant then assumes all responsibility, and liability, for injuries that the plaintiff intentionally commits upon himself. The assumption of a duty to protect the decedent while in defendant's custody merely establishes a legal basis for holding defendant negligent. The mere existence of a duty does not automatically lead to the conclusion that the decedent's fault should not be considered. Decedent's fault, or contributing cause of his injury, is his intentional and unreasonable exposure to the danger created by defendant's negligence. 2 Restatement Torts, 2d, § 466, p 511.

The conceptual difficulty which appears to blind the signers of the lead opinion arises from the use of the word "negligence" in *Placek's*[3] reference to the conduct of the plaintiff.[4] It is clear from *Placek*

---

[1] See Prosser & Keeton, Torts (5th ed), § 44, p 311; *Jamison v Storer Broadcasting Co,* 511 F Supp 1286 (ED Mich, 1981); *Dist of Columbia v Peters,* 527 A2d 1269, 1275 (DC App, 1987); *Lancaster v Montesi,* 216 Tenn 50; 390 SW2d 217 (1965); *Stasiof v Chicago Hoist & Body Co,* 50 Ill App 2d 115; 200 NE2d 88 (1964); *Wallace v Bounds,* 369 SW2d 138 (Mo, 1963); *Scott v Greenville Pharmacy, Inc,* 212 SC 485; 48 SE2d 324; 11 ALR2d 745 (1948).

[2] See *McLaughlin v Sullivan,* 123 NH 335; 461 A2d 123 (1983); *Seiler v Bethany,* 746 P2d 699 (Okla Ct App, 1987).

[3] *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979).

[4] This problem was discussed in Prosser & Keeton, Torts (5th ed), § 65, p 453:

that the goal of the Court was to establish "a fair system of apportionment of damages." *Id.* at 660. This goal is not served; rather, it is thwarted when a slightly negligent defendant is held liable for one hundred percent of the damages caused principally by the wrongful intentional conduct of a plaintiff.

Jurors are capable of reaching a rational and sensible balance between the decedent's fault and the negligent jailer's fault. Comparison of "qualitatively different" conduct, which the signers of the lead opinion find to be "not capable of intelligent comparison,"[5] is not only possible, but is required by this Court's adoption of "pure" comparative fault. Many courts, including Michigan courts, have successfully compared the fault of both parties in similar instances.[6] With the proper instruction, a jury will not necessarily preclude recovery for the plaintiff by finding the plaintiff one hundred percent at fault because of his intentional act of suicide. An instruction on comparative fault is

It is perhaps unfortunate that contributory negligence is called negligence at all. "Contributory fault" would be a more descriptive term. Negligence as it is commonly understood is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the actor himself. Negligence requires a duty, an obligation of conduct to another person. Contributory negligence involves no duty, unless we are to be so ingenious as to say that the plaintiff is under an obligation to protect the defendant against liability for the consequences of the plaintiff's own negligence.

[5] *Ante*, p 444.

[6] See *Davis v Detroit,* 149 Mich App 249; 386 NW2d 169 (1986), *York v Detroit (After Remand),* 438 Mich 744; 475 NW2d 346 (1991), *Molton v City of Cleveland,* 839 F2d 240 (CA 6, 1988), *Dezort v Hinsdale,* 35 Ill App 3d 703; 342 NE2d 468 (1976) (the court found that the issue of contributory fault of the decedent in a jail suicide case was a question for the jury), and *Belen v Harrell,* 93 NM 601, 604; 603 P2d 711 (1979) (the trial court erred in refusing to instruct the jury regarding contributory negligence in a jail suicide case).

necessary to apportion the damages between two parties responsible for the injury.[7]

In the present case, the jury found Officer Zezulka negligent for failing to remove Mr. Hickey's belt. While she should be held accountable for enhancing the risk of suicide, Mr. Hickey should also be responsible for his own conduct.

CAVANAGH, C.J., and BOYLE and GRIFFIN, JJ., concurred with RILEY, J.

LEVIN, J. I write separately because the findings of the Court of Claims judge support application of the building exception to governmental immunity, and the judgment entered on that basis for the plaintiff.[1]

I

John Hickey was arrested for drunken driving by Linda Zezulka, an officer of the Michigan State University Department of Public Safety. He was taken to the Department of Public Safety. He was placed in a holding cell at 3:20 A.M.

Although an MSU Department of Public Safety rule mandated the removal of potentially danger-

---

[7] It may be true, as noted in the lead opinion, that a few jurisdictions do not apply comparative fault principles in strict products liability cases (*ante,* p 444, n 11). However, many other jurisdictions do apportion fault in such cases. See, e.g., *Sun Valley Airlines, Inc v Avco-Lycoming Corp,* 411 F Supp 598 (D Idaho, 1976); *Butaud v Suburban Marine & Sporting Goods, Inc,* 555 P2d 42 (Alas, 1976). In Michigan, the application of comparative fault principles to products liability cases is required by statute. MCL 600.2949(1); MSA 27A.2949(1). This statute applies to *all* products liability actions, including those based upon breach of warranty. *Karl v Bryant Air Conditioning,* 416 Mich 558, 569; 331 NW2d 456 (1982). Such an action "generally focuses upon the fitness of the product, irrespective of the defendant's conduct." *Prentis v Yale Mfg Co,* 421 Mich 670, 692; 365 NW2d 176 (1984). It is, therefore, apparent that courts and juries *are* able to compare different kinds of conduct and that such a comparison is even required by statute in certain actions.

[1] MCL 691.1406; MSA 3.996(106).

ous personal articles,[2] Zezulka did not remove Hickey's belt or any other article of clothing. At 3:57 A.M., Zezulka went to the holding cell to remove Hickey for transportation to the Ingham County Jail. She found that he had hanged himself with a noose he first fashioned from his belt and socks, and then attached to a protruding metal bracket holding a heating unit to the wall of the cell. He was pronounced dead on arrival at a hospital.

Hickey's father, John Hickey, Jr., filed an action against Zezulka and other defendants[3] alleging negligence and intentional and grossly negligent acts in violation of Hickey's civil rights under 42 USC 1983. He also commenced an action against Michigan State University in the Court of Claims, asserting that the holding cell Hickey was placed in was in a dangerous or defective condition and that MSU had also violated Hickey's civil rights under 42 USC 1983.

A jury found that Zezulka was negligent and had violated Hickey's civil rights, and that this was a proximate cause of his death, and awarded $1 million in damages. The Court of Claims found that the holding cell was in a dangerous and defective condition and that this was a proximate cause of Hickey's death, and awarded $650,000 in damages. Both awards were affirmed by the Court of Appeals.

---

[2] The rule—Police Services General Order Number 82-09—provides:

> No prisoner shall be left unattended unless he is first searched and secured in a segregation room. All offensive and defensive weapons or other objects which could harm an officer, the prisoner or other prisoners shall be removed and properly secured.

[3] The jury found the other defendants negligent, but that their negligence was not a proximate cause of Hickey's death.

II

The finder of fact in the Court of Claims was the trial judge in the negligence action. The judge found that the cell in which Hickey was placed was used not only for temporary detention, but for temporary detention *of inebriated persons:*

> Now, intoxication has been a problem for years, and I don't think it's any secret to Michigan State University in dealing with the students on their campus that they deal on a regular basis with intoxicated individuals. . . . [I]t appears that their procedure is pretty consistent with other agencies in dealing with persons arrested for driving while intoxicated; namely, that they are held until such time as they may safely be released. And the purpose of holding, as [defense expert] Mr. Kamka stated, was for the detoxification process.
>
> *   *   *
>
> Now, Michigan State University, in the opinion of this Court, knew that intoxicated persons would be placed in the facility, and the Court would so find. And if it was only for holding purposes, then it should not have been used for purposes which went beyond holding . . . .
>
> *   *   *
>
> I guess the bottom line, though, is that if Michigan State University had individuals who were intoxicated, then they should not have placed individuals in cells which were not designed for persons who were intoxicated.
>
> *   *   *
>
> . . . Michigan State, in essence, has admitted that it had no detoxification cell. It [Room 171] was being used, in the opinion of this Court, for precisely that purpose.

The judge further found that, used as a cell for the temporary detention of inebriated persons, the cell was dangerous and defective:

But the Court is of the opinion, based on the testimony and the testimony which the Court deems credible and applying not a standard of preponderance of the evidence but a standard . . . of beyond a reasonable doubt, is of the opinion that the facility here was improper by design in the specific manner alleged, the bench location and the location of the heating device. And the Court's opinion in large part, in very large measure, rests on the testimony of [defense expert] Mr. Kamka.

\* \* \*

[T]he Court is of the opinion, and disregarding the question of the lighting, that Mr. Kamka's testimony was clear and unequivocal that the heating device should have been recessed or in a position other than where it was located.

\* \* \*

But the Court is of the opinion that Mr. Kamka himself indicated he would have recommended that the heating device be removed and that it should not have been placed in the position in which it was located.

\* \* \*

Now, this device was in such close proximity to anyone standing on the bench that it was a ready-made tool for anyone in a position to want to use it.

The judge also found that the defect was a proximate cause of Hickey's death:

The Court is of the opinion that the existence of the heating device in the form in which it existed over the bench was a proximate cause of the death of the decedent.

The judge further found that MSU had knowledge of this defect and failed to take action to protect those confined in the cell:

So even if I'm to disregard all other testimony and rely primarily on that of Mr. Kamka, the Court is of the opinion that the experience was such that no holding facility should be built with an exposed device which provides access for suicide.

* * *

And I find it very difficult to even conceive of building a modern-day facility—and I'm not talking 1984 or '85; I'm talking 1970 and even before that—with a device protruding from a wall in such close proximity to a bench or that which is able to be reached by someone who has been placed in such a cell.

* * *

Now, Michigan State University, in the opinion of this Court, knew that intoxicated persons would be placed in the facility, and the Court would so find. And if it was only for holding purposes, then it should not have been used for purposes which went beyond holding in the sense that it was argued to this Court.

* * *

In conclusion on that issue, Michigan State, in essence, has admitted that it had no detoxification cell. [Room 171] was being used, in the opinion of this Court, for precisely that purpose. Michigan State had prior knowledge of the use of alcoholic beverages on the campus, the need or the reality of arresting individuals who are overintoxicated or are intoxicated, over-imbibed or whatever, and yet chose to use a cell which was not designed for that purpose for temporary placement of such individuals. In the opinion of this Court, that was an improper use of the cells or, in the specific, of the cell in question here relative to the placement of this individual.

The finder of fact thus concluded that the cell was specifically assigned for temporarily holding

persons arrested for drunk driving, and not merely for "temporary detention."[4]

The question, therefore, is not whether "any jail or holding cell could be [made] 'suicide proof,' "[5] but, rather, having in mind that the holding cell was used as. a temporary holding cell for inebriated persons, whether it was dangerous or defective to the extent that, had it been more carefully designed or constructed, or equipped with safety devices, the suicide of John Hickey would have been less likely to have occurred. *Bush v Oscoda Area Schools,* 405 Mich 716, 730; 275 NW2d 268 (1979).[6]

The majority concludes that the cell was "specifically intended and assigned for temporary detention."[7] There was, however, testimony that the cell was used, on many occasions, as a temporary detention cell for persons arrested for OUIL, and the finder of fact so found.

The issue in *Bush* was whether a schoolroom, *temporarily* being used as a science laboratory, was dangerous or defective. A student had been injured by an alcohol explosion during a laboratory experiment. This Court said:

> The trier of fact must determine whether the room was defective when used as a physical science classroom and, if so, whether the defect was a cause of Foxworth's injuries. *Conceding that the alleged "course of classroom conduct . . . would be dangerous even in a properly equipped labora-*

[4] BRICKLEY, J., *ante,* p 426.

[5] *Id.*

[6] In *Reardon v Dep't of Mental Health,* 430 Mich 398, 410; 424 NW2d 248 (1988), this Court referred to *Bush* and *Lockaby v Wayne Co,* 406 Mich 65; 276 NW2d 1 (1979), as cases where the building exception applies when the design or use is dangerous or defective in light of the uses or activities for which the building has been designed or is being used.

[7] *Ante,* pp 425-426.

tory," it is yet possible that if the room were properly equipped the accident would not have occurred or the injuries would have been less severe. The question of the significance of the defect in relation to the alleged injuries is a question of fact. [Id. at 732. Emphasis added.]

This Court in Bush thus held, in effect, that although no laboratory can be made "danger proof," the trier of fact could nevertheless conclude that it was defective, and that the defect was a cause of the injury.[8]

Accordingly, the absence of expert testimony that a cell might be made "suicide proof" is not determinative.

---

[8] The opinion refers to "a" cause. The defect here alleged, thus, need not have been the sole cause, and the triers of fact properly found that the building defect and Zezulka's negligence were both proximate causes of the injury.