ROSS v GLASER

Docket No. 166014. Submitted December 19, 1995, at Detroit. Decided November 22, 1996, at 9:05 A.M. Leave to appeal sought.

Rosalee J. Ross, as personal representative of the estate of Forrest Ross, brought an action in the Wayne Circuit Court against John Glaser, alleging that the defendant was negligent in handing to Anthony Glaser, his son, the loaded gun that Anthony later used to shoot and kill Forrest Ross. On the day of the shooting, an altercation took place in front of the Glaser residence between Anthony Glaser and friends of Forrest Ross. Anthony Glaser, who suffered from a psychosis, was subject to "rage attacks," and had a history of tense relations with Forrest Ross and his friends, entered the Glaser residence and asked the defendant to hand him a loaded gun that he had purchased after earlier confrontations. The defendant complied with Anthony's request, but then followed Anthony and attempted to physically restrain him while neighbors called the police. While the defendant was talking to the police, Anthony got into his automobile, drove off, encountered Forrest at a neighborhood store, and shot and killed him. The defendant moved for summary disposition on the bases that he owed no duty to protect third parties from Anthony's criminal acts and that his act in handling the gun was not the proximate cause of the death. The trial court, Susan Bieke Neilson, J., granted summary disposition for the defendant on the basis that he owed no duty to protect the decedent from Anthony's criminal acts. The plaintiff appealed, and the defendant cross appealed.

The Court of Appeals *held*:

Under the facts of this case, the granting of summary disposition for the defendant was inappropriate.

Reversed and remanded.

MARILYN KELLY, J., would find that because at the time he handed the gun to his son the defendant was aware of his son's psychiatric condition, including being subject to "rage attacks," and of the prior conflicts that had led to the purchase of guns, the son's use of the gun to shoot someone was a foreseeable consequence of the defendant's act of handing the gun to his son. Under the circumstances, although the defendant may not have had a duty to act, he

did have a duty to refrain from acting in a manner that would create an unreasonable risk of harm.

MARKMAN, P.J., dissenting, stated that, under the facts of this case, the risk of harm to the plaintiff's decedent was not foreseeable by the defendant at the moment that he handed the gun to his son, the defendant's act was not cause in fact of the decedent's death, and the defendant's act was not a proximate cause of the shooting that resulted in the decedent's death; accordingly, the defendant owed no duty of care to the decedent.

*Lopatin, Miller, Freedman, Bluestone and Herskovic* (by *Richard E. Shaw*), for the plaintiff.

*Collins, Einhorn, Farrett & Ulanoff, P.C.* (by *Kenneth C. Merritt* and *Noreen L. Slank*), for the defendant.

Before: MARKMAN, P.J., and MARILYN KELLY and L. V. BUCCI,* JJ.

MARILYN KELLY, J. Plaintiff appeals as of right and defendant cross-appeals from an order granting summary disposition to defendant in this wrongful death action pursuant to MCR 2.116(C)(8). Plaintiff argues that it was for the jury to decide whether defendant could be held liable for giving a handgun to his mentally impaired son who used it to kill plaintiff's decedent. We reverse.

I

On September 29, 1991, Anthony Glaser was outside his parents' home. Four friends of decedent's family engaged him in a verbal altercation. Apparently, there was a history of tension between the Glaser family and the Ross family. Members of the Ross family and neighborhood rivals had assaulted or

---

* Circuit judge, sitting on the Court of Appeals by assignment.

harassed Anthony, who suffered from a psychosis and other mental disturbances. The encounters caused Anthony to purchase three guns in the summer of 1991.

On the day in question, neighborhood youths had been taunting Anthony. In an agitated state, he entered the family house and yelled to defendant to hand him one of the guns. Defendant complied. Anthony obscured the gun from view behind his waistband and returned outside. Defendant followed and attempted to physically restrain Anthony while calling for neighbors to contact the police.

When police officers arrived, defendant and his wife argued with them regarding the ineffectiveness of the police in dealing with the harassment. In the meantime, Anthony got into his automobile and drove away. Within minutes, he encountered plaintiff's decedent outside a neighborhood store and shot him to death. Anthony was found guilty but mentally ill of second-degree murder.

Plaintiff then filed this wrongful death action against defendant. In it, she claims that defendant was negligent for handing a loaded gun to his unstable son, knowing his agitated state and the history of confrontation between the families.

Defendant moved for summary disposition, arguing that he owed no duty to protect third parties from Anthony's criminal acts. He also claimed that his act of handing Anthony the gun was not the proximate cause of the death. The trial court relied on *Bell & Hudson, PC v Buhl Realty Co*, 185 Mich App 714; 462 NW2d 851 (1990). It ruled that the familial relationship was insufficient to impose a duty upon defend-

ant to protect the general public or plaintiff's decedent from Anthony's criminal acts.

## II

As part of a prima facie case of negligence, a plaintiff must prove that the defendant owed him a duty. *Schultz v Consumers Power Co*, 443 Mich 445, 449; 506 NW2d 175 (1993). Duty is a legally recognized obligation to conform to a particular standard of conduct toward another. *Chivas v Koehler*, 182 Mich App 467, 475; 453 NW2d 264 (1990). Duty comprehends whether the defendant is under any obligation to the plaintiff to avoid negligent conduct; it does not include the nature of the obligation. *Moning v Alfono*, 400 Mich 425, 437; 254 NW2d 759 (1977). If the court determines as a matter of law that a defendant owed no duty to a plaintiff, summary disposition is properly granted under MCR 2.116(C)(8). *Dykema v Gus Macker Enterprises, Inc*, 196 Mich App 6, 9; 492 NW2d 472 (1992).

In this case, defendant argues that he has no duty to control the conduct of third parties absent a special relationship to them, particularly when the conduct is criminal. See 2 Restatement Torts, 2d, §§ 314-315, pp 116-123. He asserts that the father-son relationship is insufficient to establish the required special relationship that would impose a duty on him. See generally *Bell & Hudson, PC, supra*.

The argument is unavailing. Michigan courts have distinguished active misconduct causing personal injury (misfeasance) and passive inaction or the failure to protect others from harm (nonfeasance). *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498; 418 NW2d 381 (1988). Generally, with respect to

nonfeasance, there is no legal duty that obligates a person to aid or protect another. *Id.* at 498-499. An exception has developed where a special relationship exists between the persons. *Id.* at 499; *Dykema, supra* at 8; *Bell & Hudson, supra.*

However, defendant's act of handing a loaded gun to Anthony was not one of nonfeasance, but rather misfeasance. Therefore, the special relationship doctrine is inapplicable, and the trial court erred in relying on *Bell & Hudson, supra.* Instead, we must determine whether defendant had a duty to refrain from handing Anthony a loaded weapon.

Several considerations underlie the determination whether a duty exists: (1) the foreseeability of the harm; (2) the degree of certainty of injury; (3) the closeness of the connection between the conduct and the injury; (4) the moral blame attached to the conduct; (5) the public policy of preventing future harm; and (6) the burdens and consequences of imposing a duty and the resulting liability for breach. *Buczkowski v McKay,* 441 Mich 96, 101, n 4; 490 NW2d 330 (1992); *Babula v Robertson,* 212 Mich App 45, 49; 536 NW2d 834 (1995).

As to foreseeability, we determine whether it is foreseeable that the conduct may create a risk of harm to the victim and whether the result and intervening causes were foreseeable. *Moning, supra* at 439; *Berry v J & D Auto Dismantlers, Inc,* 195 Mich App 476, 481; 491 NW2d 585 (1992).

Looking at the record in this case, Anthony was chronically mentally unstable, having been diagnosed as paranoid schizophrenic and hospitalized numerous times. An intense neighborhood conflict existed between Anthony and the Ross family and their

"backers." Numerous police reports were filed because of this conflict during the summer and fall of 1991. As a result of the conflict, Anthony purchased three guns that summer. On the day of the shooting, four young men harassed Anthony. He ran into the house and yelled to defendant to get his gun. Despite his knowledge of his son's mental instability and his awareness of the neighborhood conflict which was manifesting itself at that very moment, defendant handed the gun to Anthony.

Under these circumstances, the harm was foreseeable. When defendant handed the gun to Anthony, it was foreseeable that Anthony would shoot someone. It is true that the harm did not befall one of the four antagonists while outside the Glaser home. Nevertheless, when defendant gave the gun to Anthony, it was foreseeable that he would respond to a perceived threat by firing it at a member of the Ross family. The Rosses were at the center of the antagonism. It is not necessary that the manner in which a person might suffer injury be foreseen or anticipated in specific detail. *Babula, supra* at 53.

With respect to the issue of duty, the dissent erroneously maintains that a duty should not be imposed here, for the sole reason that the shooting was unforeseeable. Our Supreme Court has held that the question of duty depends only in part on foreseeability. Other considerations are usually more important. *Buczkowski, supra* at 101.

In *Buczkowski*, the Court held that a duty should not be imposed on a retailer who sold ammunition to an allegedly incompetent person who later injured another while using the ammunition. The Court noted that it was unforeseeable what action the customer

would take with the ammunition. The Court further stated:

> Where foreseeability fails as an adequate template for the existence of a duty, recourse must be had to the basic issues of policy underlying the core problem whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. [*Id.* at 102.]

The Court noted that a duty could be imposed despite the actual lack of foreseeability. *Id.* at 108. In *Buckzkowski*, because there was no evidence that the customer acted in a threatening manner or was legally incompetent, the Court declined to impose a duty on the defendant. *Id.* at 109.

Here, the relationship between the parties is much different from that in *Buczkowski*. Defendant knew that his son was mentally incompetent, had been hospitalized several times due to his mental illness and was subject to "rage attacks" at the slightest provocation. Under those circumstances, defendant had a duty not to hand his son a loaded weapon. The likelihood of injury is high when a mentally ill individual is handed a loaded gun while in an agitated state and in conflict with antagonists.

Moreover, the proximity in time between defendant's conduct and the shooting of one of Anthony's antagonists is sufficiently close to give rise to a duty. Anthony is the one most blameworthy for the shooting death of plaintiff's decedent. However, defendant put the gun in his hands. Under the circumstances, his conduct carries some degree of moral blame.[1]

---

[1] We do not, as the dissent suggests, focus only on moral blame in imposing a duty on defendant. It is but one of several factors to be con-

Finally, the determination that defendant owed a duty not to create an unreasonable risk of harm to others enforces a public policy that prevents harm to third persons. Moreover, the burden on members of the public in imposing a duty under these circumstances is slight. In *Buczkowski*, the Court examined whether a duty should be placed on a retailer to inquire into every customer's possible use of potentially harmful products which the retailer sells. The Court concluded that such a duty would cause potentially harmful products either to become unavailable to law-abiding citizens or become more expensive as sellers redistributed the costs of potential liability to all consumers. *Buczkowski, supra* at 108. Therefore, the burden placed on the general public by imposing a duty on retailers was high.

Here, however, there is no increased burden, financial or otherwise, placed on members of the public, other than those who would give loaded weapons to mentally impaired individuals. They now have an increased burden to refrain from taking such action.

We note that we are not finding that defendant had a duty to act where he failed to act. Rather, he had a duty not to act if, by doing so, he would create an unreasonable risk of harm.

Further authority for our position is found in 2 of the Restatement Torts 2d, § 302B, p 88, which states:

> An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a

sidered. *Baker v Arbor Drugs, Inc,* 215 Mich App 198, 203; 544 NW2d 727 (1996).

third person which is intended to cause harm, even though
such conduct is criminal.

Illustration 11 gives the following example:

> A gives an air rifle to B, a boy six years old. B intention-
> ally shoots C, putting out C's eye. A may be found to be
> negligent towards C. [*Id.* at 92.]

Here, even though Anthony is not a youngster, the
evidence reveals that he was undergoing treatment
for recurrent mental illness. Defendant knew this, but
nevertheless gave him a loaded gun. He should have
realized that the action could reasonably result in
injury to another. Defendant did not merely fail to
prevent harm; he increased the risk of harm by pro-
viding Anthony with the loaded gun.

The dissent states that a duty should not be
imposed in this case because of a lack of evidence
that Anthony's problems had ever before manifested
themselves in violence. However, the deposition testi-
mony reveals that, in early childhood, Anthony began
to develop severe obsessions and compulsions. Every-
thing in his life had to be controlled and orderly.
When it was not, he would "fly into rage attacks and
be uncontrollable at times." As he grew up, the rage
reactions continued; he would become violent, break
things and punch holes in walls. During adolescence,
he was diagnosed as a paranoid schizophrenic. He felt
persecuted and often felt things were worse than they
actually were. While the dissent apparently would
wait until the first person was injured before impos-
ing a duty on defendant not to hand such an individ-
ual a loaded weapon, it is preferable to prevent the
first incidence of violence from occurring. Therefore,
the trial court erred in dismissing this case pursuant

to MCR 2.116(C)(8), on the basis that defendant owed
no duty to plaintiff's decedent.

### III

The dissent reasons that this action was appropri-
ately dismissed because defendant's conduct cannot
be characterized as a cause-in-fact of the shooting.
However, defendant does not raise the issue of cause-
in-fact in his cross-appeal. Defendant argues in his
cross-appeal only that Anthony's conduct was an
intervening superseding cause and that his actions
were not the legal cause of decedent's death. There-
fore, the cause-in-fact issue is not properly before this
Court. *Froling v Carpenter*, 203 Mich App 368, 373;
512 NW2d 6 (1994).

Even if the issue were properly before us, a ques-
tion of fact exists as to whether defendant's handing a
loaded weapon to Anthony was a cause-in-fact of the
shooting. By giving Anthony a loaded weapon,
defendant was in effect telling him that it was permis-
sible to use it. Anthony did just that when he encoun-
tered decedent. But for defendant giving Anthony the
gun, the shooting might not have occurred.

### IV

In his cross-appeal, defendant argues that, even if a
duty is found, summary disposition is still appropri-
ate, because his actions were not the proximate cause
of the death. The trial court specifically declined to
address this issue. Because the facts are undisputed,
we will address it now.

The question of proximate cause, like duty,
depends in part on foreseeability. *Moning, supra* at
439. Proximate cause is that which operates to pro-

duce particular consequences without the intervention of any independent, unforeseen cause, without which the injuries would not have occurred. *McMillan v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985); *Babula, supra* at 54. It involves a determination that the connection between the wrongful conduct and the injury is of such a nature that it is socially and economically desirable to hold the wrongdoer liable. *Adas v Ames Color-File*, 160 Mich App 297, 301; 407 NW2d 640 (1987). Proximate cause is usually a factual question to be decided by the jury. *Schutte v Celotex Corp*, 196 Mich App 135, 138; 492 NW2d 773 (1992).

Here, defendant argues that Anthony's intervening acts of getting into the car, driving to a store and shooting decedent were superseding acts which cut off liability. However, an intervening act is not a superseding act if the injury was reasonably foreseeable. *Hickey v Zezulka (On Resubmission)*, 439 Mich 408, 437 (BRICKLEY, J), 447 (RILEY, J); 487 NW2d 106 (1992). When a defendant's negligence enhances the likelihood that the intervening act will occur, the act is reasonably foreseeable, and the defendant remains liable. *Hickey, supra* at 438 (BRICKLEY, J), 447 (RILEY, J).

Here, reasonable minds could differ on whether Anthony's intervening actions superseded defendant's actions, thus cutting off his liability. *Arbelius v Poletti*, 188 Mich App 14, 21; 469 NW2d 436 (1991). Anthony did not shoot a stranger. Nor did he shoot decedent weeks, days or even hours after the confrontation outside his parents' home. Rather, Anthony shot decedent just minutes after defendant handed him a loaded gun, and just minutes after the confrontation outside his parents' home had ended. It is argu-

able, then, that the trier of fact could find that Anthony's intervening acts were foreseeable and should not relieve defendant of liability. *Arbelius, supra* at 19. Under the facts presented in this case, we conclude that summary disposition was inappropriate.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

L. V. Bucci, J., I concur in the result only.

Markman, P.J., *(dissenting)*. I respectfully dissent and would affirm the judgment of the trial court. The majority would impose liability upon defendant for the criminal acts of a third party under circumstances so remote and unforeseeable that no duty from defendant to the decedent can fairly be found. Even if such a duty could be discerned, I believe that there is no proximate causal relationship between defendant's conduct and plaintiff's injuries—or even a causation in fact relationship. While I do not disagree with Judge Kelly's characterization of the law of negligence in Michigan, I strongly disagree with the application of such law to the present situation. The critical facts are as follows:

(1) In the context of a quarrel with neighborhood youths who defendant and his adult son felt had been harassing the son, and against whom he may have felt the son needed to defend himself, defendant handed his son the son's firearm in response to the son running up to the house and urgently demanding it. On one earlier occasion, the son had had a firearm brandished at him.

(2) After handing the firearm to his son, defendant followed his son and attempted to physically restrain him from directing the firearm toward the youths. Possibly as a result of this effort, the son did not use his firearm against the youths.

(3) At the same time he attempted to restrain his son, defendant screamed to neighbors to call the police.

(4) The police, in fact, arrived shortly thereafter. At or shortly before that time, the youths dispersed and the son went back into the house with the firearm tucked away in his belt. The police questioned defendant about what had occurred.

(5) Without the apparent knowledge of defendant, his son then obtained the keys to his own car from the house and drove off in his own car.

(6) The son stored a second firearm in the house from where he had obtained the car keys and a third firearm in the glove compartment of the car in which he had driven off.

(7) Without the apparent knowledge of defendant, his son drove to a nearby convenience store.

(8) Apparently by chance, the son encountered the decedent, another neighbor with whom the son had been feuding, outside the convenience store.

(9) The son rammed the decedent's car with his own car, got out of his car, and shot the decedent six times with the firearm earlier handed to him by defendant.

(10) Although mentally disturbed and subject to fits of rage, the son had no history of violence or firearm use.

"Negligence is not actionable unless it involves the invasion of a legally protected interest, the protection

of a right." *Palsgraf v Long Island R Co*, 248 NY 339, 341; 162 NE 99 (1928). Whatever the wisdom of defendant's decision to hand his son a firearm, I do not believe that he owed a duty recognized in the law to the decedent. In determining whether a duty exists, the foreseeability of the harm is a critical consideration.[1] *Colangelo v Tau Kappa Epsilon Fraternity*, 205 Mich App 129, 132; 517 NW2d 289 (1994). The foreseeable harm envisioned by defendant when he handed his son the firearm was that his son would use the firearm to harm one of the youths who were allegedly harassing him outside their home. In my judgment, the dissipation of this threat with the police arriving at the scene, the youths dispersing, and the son returning inside the house constituted an intervening circumstance that effectively severed the linkage between defendant's action and his son's subsequent criminal conduct. What happened after this episode could not reasonably have been foreseen by defendant, and he is, therefore, not legally responsible.

---

[1] Judge KELLY cites *Buczkowski v McKay*, 441 Mich 96; 490 NW2d 330 (1992), for the proposition that considerations other than foreseeability are usually more important in determining whether a duty exists. The *Buczkowski* Court supported this point by quoting from *Samson v Saginaw Professional Bldg, Inc*, 393 Mich 393, 406; 224 NW2d 843 (1975): " '[T]he mere fact that an event may be foreseeable does not impose a duty upon the defendant to take some kind of action accordingly.' " *Buczkowski, supra* at 101. Thus, the *Buczkowski* Court indicates that foreseeability is a *necessary* condition of duty, but not always a *sufficient* condition to establish duty. That foreseeability alone is insufficient to establish duty does not mean that a lack of foreseeability is insufficient to establish a lack of duty. Accordingly, *Buczkowski* does not undermine the analysis here that focuses on the unforeseeability of the decedent's death at the time defendant handed the gun to his son in concluding that defendant owed no duty to the decedent.

Had the son used the firearm handed to him by his father to shoot one of the youths outside their home, this would have been a substantially different matter. Such an act would have been a far more direct and foreseeable consequence of defendant's conduct. It would not have mattered in determining his legal duty, under such a circumstance, that defendant had not foreseen which particular youth would be shot; any of them would have been within the *class* of potential victims reasonably foreseeable by defendant under the circumstances. However, defendant should not be held accountable for *any* subsequent actions by his son—no matter how unpredictable, no matter how attenuated the causal link—simply because his son may have been "agitated" at the time he was handed the firearm by his father. In determining the existence of a legal duty, the law focuses upon "whether it is foreseeable that the actor's conduct may create a risk of harm to *the* victim." *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977). Defendant's legal duty to ensure that his conduct did not create a risk of harm to the youths outside his home does not transform itself into a legal duty with regard to the rest of the world. Defendant could not reasonably have anticipated his son's conduct following the events outside their home. Unbeknown to defendant, his son returned into their house, retrieved his keys, and drove off in his own car. Unbeknown to defendant, his son drove to a nearby convenience store. Unbeknown to defendant (and to his son), the decedent was outside the store. Unbeknown to defendant, his son proceeded to ram the decedent's car, leave his car, and carry out a criminal act by shooting the decedent. When defendant handed the

firearm to his son, it was simply not foreseeable that anything approximating this chain of events would occur.

Judge KELLY states that "it was foreseeable that [the son] would respond to a perceived threat by firing [the firearm] at a member of the Ross family." *Ante* at 188. Judge KELLY offers no support for this conclusory statement. There was no "member of the Ross family" among the youths outside defendant's home. There is no evidence that the son was searching for a "member of the Ross family" when he drove off in his car. There is no evidence that any "member of the Ross family" was likely to be found at the convenience store. If this were the son's intention, one would suppose that he would have gone directly to the Ross house nearby, where he was far more likely to have encountered "members of the Ross family" than at the local convenience store. To extrapolate from the fact that his son harbored ill feelings toward the Ross family that it was foreseeable on defendant's part that the son would shoot a member of the Ross family, under circumstances concerning which defendant had no knowledge, at a place where neither he nor his son had any expectation of ever encountering a member of the Ross family, is a convolution that would impose an extraordinarily broad legal duty upon defendant. In my judgment, such an imposition is without authority. No legal duty at all is owed to the unforeseeable plaintiff. See, generally, *Palsgraf, supra.*[2]

---

[2] Judge KELLY asserts that I would "wait until the first person was injured before imposing a duty on defendant." *Ante* at 191. Such an observation illustrates the majority's confusion over how to approach cases such as this one. The fact that a tragic injury has occurred should not

Second, I do not believe that defendant's conduct can properly be characterized as a cause in fact of the decedent's shooting. Cause in fact generally requires a showing that "but for" the defendant's action, the plaintiff's injury would not have occurred. *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994), citing Prosser & Keeton, Torts (5th ed), § 41, p 266. As the Supreme Court stated in *Dedes v Asch*, 446 Mich 99, 106, n 2; 521 NW2d 488 (1994), quoting 4 Harper, James & Gray, Torts (2d ed), § 20.2, pp 89-91:

> "Through all the diverse theories of proximate cause runs a common thread; almost all agree that *defendant's wrongful conduct must be a cause in fact of plaintiff's injury before there is liability. This notion is not a metaphysical one, but an ordinary matter-of-fact inquiry into the existence or nonexistence of a causal relation as lay people would view it.* Clearly, this is not a quest for a sole cause. Probably it cannot be said of any event that it has a single causal antecedent; usually there are many." [Emphasis added.]

A plaintiff "must adequately establish cause in fact in order for legal cause or 'proximate cause' to become a relevant issue." *Skinner, supra* at 163. Absent defendant's action in the instant case, his son would have had exactly the same state of mind, exactly the same access to his own firearms, exactly the same

---

obscure the fact that in analyzing *defendant's* responsibility for such an injury, the starting point is the foreseeability that such an injury would occur. Negligence lawsuits will frequently involve tragic injuries. Our task is not to fashion a rule that will hold the greatest number of persons potentially responsible; rather, it is to determine which persons are properly held responsible. In fact, there may well be many cases in which, "until the first person [is] injured," it would be unfair to hold a person responsible for an injury that was unforeseeable before that time (i.e., no legal duty to the victim existed).

access to his own car, exactly the same likelihood of accidentally encountering the decedent, and exactly the same inclination to carry out a heinous crime. The killing of the decedent would have occurred under exactly the same circumstances, with or without defendant's action in handing his son a firearm. There is, in essence, no "but for" demonstration possible here, and, therefore, no causation in fact.

Third, I do not believe that defendant's conduct was a proximate cause of the shooting in view of the intervening events that transpired. "The questions of duty and proximate cause are interrelated because . . . both depend in part on foreseeability." *Moning*, *supra* at 439. The foreseeability analysis in the proximate cause context is a more subtle one that emphasizes the remoteness of events. As the Supreme Court has observed:

Once a jury or judge has found that the defendant was negligent and that the plaintiff suffered injuries, it must be determined, whether the plaintiff's injuries were *caused* by the defendant's wrongful conduct and, then, if the defendant did *cause* the injuries, judge whether the plaintiff's injuries were too insignificantly related to or too remotely effected by the defendant's negligence.

Of all the elements necessary to support recovery in a tort action, causation is the most susceptible to summary determination for it usually amounts to a logical connection of cause to effect. [*Davis v Thornton*, 384 Mich 138, 145; 180 NW2d 11 (1970).]

Beyond the merely unanticipated nature of the events that occurred between the time of defendant's action and the shooting, the instant facts indicate that the son, without defendant's involvement, easily could have obtained one of his firearms before the shooting.

In the course of either obtaining his car keys or driving to the convenience store—both of which actions were necessary conditions precedent to the shooting—the son had full access to his own firearms. His ready access to these firearms made it virtually irrelevant that defendant handed him one of these firearms. Defendant's action was not so "significant" or integral to the shooting that it should properly be regarded as a proximate cause. As part of the chain of events leading to the shooting, defendant's action was genuinely incidental, neither leading inexorably to the tragedy that occurred nor precipitating any dangerous or destructive force that could not later be contained. While Judge KELLY is correct that the specific manner or detail of the injury need not be foreseen or anticipated, *Babula v Richardson*, 212 Mich App 45, 53; 536 NW2d 834 (1995), to characterize the *Palsgrafian* chain of events in the instant case as properly attributable to the action of defendant is to impose legal responsibility upon an individual who is not truly culpable.

Judge KELLY describes defendant's conduct as carrying "some degree of moral blame." *Ante* at 189. Indeed, it is this notion, not any analysis of cause, that is at the heart of the majority's decision.[3] The essence of Judge KELLY's argument is that the son's mental disorders made defendant's act of handing his son a firearm negligence per se, at least when he was in some state of agitation.[4] By this argument, Judge

---

[3] That the degree of a defendant's moral blame may be one *factor* in determining his legal duty to another is a distinct proposition from that which replaces the traditional negligence focus upon cause with a focus upon a defendant's alleged moral blameworthiness.

[4] Judge KELLY states that "[d]espite his knowledge of his son's mental instability and his awareness of the neighborhood conflict," *ante* at 188,

KELLY would hold defendant similarly responsible for the killing of a total stranger at the convenience store or, for that matter, for a killing occurring at almost any later juncture. Once he handed his adult son a firearm during what may have appeared to him to be an extraordinary situation, defendant was permanently ensnared in some ongoing joint venture with his son, forever responsible for any subsequent actions taken by his son no matter how unexpected these actions would have been to defendant.

While one may reasonably argue that defendant's son was not the type of person who should have been in the lawful possession of a firearm, this is a matter of public policy, any flaws of which should not be borne by defendant through having liability imposed upon him for the actions of his twenty-five-year-old son. Whatever Judge KELLY's estimation of defendant's "moral blame," because he cannot be said by any reasonable standard to have caused, or been the proximate cause of, the fatal shooting, defendant bears no legal blame.[5]

---

defendant handed the firearm to his son. Given that the neighborhood conflict ended shortly afterwards without incident, the gist of defendant's wrongdoing, as the majority sees it, is his recognition of his son's mental problems. However, defendant is given no credit for what also might have been his recognition that his son's mental problems, debilitating as they were, had never before evidenced that his son was any more capable of killing another human being than any other father's son.

[5] With regard to defendant's alleged "moral blame," had the son truly been in physical danger as his urgent call for the firearm may have reasonably suggested to the father—the son had never made such a demand before and had experienced a weapon being brandished against him in the past in the neighborhood—such a characterization would not be fair. If the firearm was handed to his son under circumstances reasonably perceived to be related to his son's self-defense, defendant's action would not be blameworthy. It can only be viewed as such if defendant knew that his son had no defensive need of a weapon—this conclusion might conceivably be drawn from the fact that the son was immediately outside the

Judge KELLY also opines that her conclusion that defendant owed a legal duty here "enforces a public policy that prevents harm to third persons" and that the imposition of this duty places only a "slight" burden on members of the public. *Ante* at 190. Not only does it place more than a "slight" burden on defendant, for one, but such a formulation of tort law replaces traditional understandings of causation with an amorphous notion of a "public policy" for which Judge KELLY cannot cite authority. Defendant is entitled to an assessment of his conduct based upon his individual responsibility for harm done, not based upon some unknown and unknowable "public policy that prevents harm to third persons." A "plaintiff sues in [his] own right for a wrong personal to [him] and not as the vicarious beneficiary of a breach of duty to another." *Palsgraf, supra* at 344. Judge KELLY jettisons a critical restraint in support of the rule of law—personal responsibility—and substitutes an indiscernible "public policy" to which defendant's interests are to be subordinated. As Justice RILEY observed in her dissent in *Falcon v Memorial Hosp*, 436 Mich 443, 490-491; 462 NW2d 44 (1990):

> Imperfect as it may be, our legal system attempts to ascertain facts to arrive at the truth. To protect the integrity of that goal, there must be some degree of certainty regarding causation . . . . To dispense with this requirement is to abandon the truth-seeking function of the law. . . . [T]ort

---

house when he demanded the firearm—or that he knew his son to be the type of person who should never be in the possession of a firearm, at least not when agitated. However, even if we determine that defendant properly deserves some "moral blame" for his action, this is not the equivalent of being legally responsible.

law should not operate by the same principles that govern lotteries and insurance policies. If the acts of the defendants did not actually cause plaintiff's injuries, then there is no rational justification for requiring defendants to bear the cost of plaintiff's damages.

" 'Proof of negligence in the air . . . will not do.' " *Palsgraf, supra* at 341, quoting Pollock, Torts (11th ed), p 455.

Judge KELLY's conclusion would also expand sharply the duty of an individual to protect others from the criminal acts of a third party. "As a general rule, there is no duty to protect against the criminal acts of a third person absent a special relationship between the defendant and the plaintiff or the defendant and the third person." *Babula, supra* at 49. See also *Bell & Hudson, PC v Buhl Realty Co,* 185 Mich App 714, 718-719; 462 NW2d 851 (1990) (finding the familial relationship to be insufficient to impose a duty upon a defendant to protect others from another family member's wrongful acts).[6] Defendant had no reason to anticipate that his son would commit a criminal act, engaged in no "common undertaking" with his son, *Farwell v Keaton,* 396 Mich 281, 292; 240 NW2d 217 (1976) (plurality opinion), and did not cause the decedent to rely upon him in any manner. For Judge KELLY repeatedly to cite the son's mental problems as a warrant for imposing extraordinary liability upon defendant, notwithstanding a lack of evidence that these problems had ever before mani-

---

[6] The majority opinion seeks to distinguish *Bell & Hudson* and concludes that the "special relationship" doctrine is "inapplicable" in this case. Even if this were so, to find that the doctrine is "inapplicable" is not tantamount to affirmatively finding that defendant *should* be held accountable for the criminal acts of a third party.

fested themselves in violence, is to rationalize a con-
clusion that cannot stand otherwise on the basis of
traditional tort principles.

The decedent's family has undergone a terrible trag-
edy, but it was defendant's son, not defendant, who
was responsible for this tragedy and who must be
held accountable. By holding defendant legally
responsible for the demons of his adult child, Judge
Kelly further compounds this tragedy. In the process,
traditional notions of individual responsibility are also
eroded a bit further. I would find that the trial court
appropriately granted summary disposition for the
defendant.