**William WHITING, Plaintiff,**

v.

**CENTRAL TRUX & PARTS, INC., an Ohio Corporation, Toledo Pipe Transport, Inc., an Ohio Corporation, Anthony Ross, jointly and severally, Defendants.**

**No. 96–73969.**

United States District Court, E.D. Michigan, Southern Division.

Nov. 12, 1997.

Gene Zamler, Southfield, MI, for Plaintiff.

Thomas J. Foley, Detroit, MI, for Defendants.

### ORDER AND OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

This matter arises out of Plaintiff William Whiting's Complaint alleging claims of common law negligence and respondeat superior.

Plaintiff is an employee of the U.S. Customs Service. During the course of his employment, Plaintiff was inspecting under the hood of a tractor. Defendant Anthony Ross, who was hauling the tractor, allegedly failed to raise the hood to its full open position and later released it, causing Plaintiff to suffer various injuries. Plaintiff asserts a claim of negligence against Defendant Ross, and claims of respondeat superior against his purported employers, Defendants Central Trux & Parts and/or Toledo Pipe Transport.

Presently before the Court is Defendants' Motion for Summary Judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Among the issues raised by Defendants' Motion are the following:

1) Whether Defendant Ross had a duty to ensure Plaintiff's safety;

2) Whether Defendant Ross's actions were the proximate cause of Plaintiff's injuries; and,

3) Whether Plaintiff is a "safety officer," and, if so, whether he is precluded by the "fireman's rule" from recovering for injuries resulting from the performance of his official duties.

## II. FACTUAL BACKGROUND

On April, 1, 1995, Plaintiff William Whiting ("Plaintiff") was performing in his capacity as a U.S. Customs inspector on the Ambassador Bridge, which spans the Detroit River between Windsor, Ontario and Detroit, Michigan. (Defense Exhibit R).[1] On that date, at approximately 12:30 a.m., Plaintiff and Customs Inspector Cathy Horste stopped a flatbed truck carrying a cargo of two semi-tractors. (Ross Deposition, p. 7). Defendant Anthony Ross, an employee of Toledo Pipe Transport, Inc., and Jerry D. Schaffner, an employee of Central Trux & Parts, Inc., were attempting to drive the flatbed into the United States from Canada. (Ross Deposition, p. 7). At the border, Plaintiff and Inspector Horste conducted a preliminary inspection of the flatbed and its cargo, and discovered discrepancies between their observations and what was declared on the prepared customs form. The Inspectors reported the discrepancies to their supervisors, who instructed them to seize the flatbed. (Whiting Deposition, p. 83).

Following this seizure, Plaintiff and Inspector Horste went back out to the flatbed to note the specific violations for each truck. (Whiting Deposition, p. 83). In the course of the second inspection[2] Plaintiff asked Defendant Ross and Mr. Schaffner to open the hood of the second semi on the flatbed, the one farthest from the cab of the flatbed, so he could record some information from the EPA label within the engine compartment. (Whiting Deposition, pp. 116, 122). The hood on this semi, a model called the Western Star, opened outward from the windshield to the front, as opposed to the hoods of most passenger vehicles, which open outward from the front of the vehicle to the windshield. (Whiting Deposition, p. 116; Schaffner Deposition, p. 22). To reach the hood of the semi, Plaintiff, Defendant Ross, and Mr. Schaffner had to climb 15 feet up, onto the flatbed where it was located. (Whiting Deposition, pp. 118, 122). Inspector Horste remained on the ground. (Schaffner Deposition, p. 25). After Plaintiff asked Defendant Ross and Mr. Schaffner to open the hood of the semi, they did so, opening it into a position which Plaintiff visually checked and believed to be the open position, based on his prior experience with that type of hood, which rocks open and is held in place by gravity (Whiting Deposition, pp. 116, 117, 119). At this time,

---

1. Plaintiff completed nine and a half week basic customs inspector training course in 1991. (Whiting Deposition, p. 10). Since that time, he has been a United States Customs Inspector based in Detroit, Michigan.

2. Mr. Schaffner, in his deposition, testified that the events relevant to this incident occurred during the first and only inspection. He stated that "any other inspections took place while we were inside" (Schaffner Deposition 23).

Defendant Ross was on the passenger side of the semi and Mr. Schaffner was on the driver's side of the semi, to Plaintiff's left. (Whiting Deposition, p. 118).

After opening the hood, Plaintiff testified that neither Defendant Ross nor Mr. Schaffner told him anything about the hood being fully open and that he did not ask them if it was fully open. (Whiting Deposition, p. 119). However, Mr. Schaffner and Defendant Ross testified they informed Plaintiff that the hood was not open all the way. (Ross Deposition, pp. 26, 27; Schaffner Deposition, p. 22). The two tractors were nose to nose on the flatbed, which may have been on an incline,[3] and the open nose of the Western Star was touching the Ford Truck. (Whiting Deposition, p. 119; Ross Deposition, p. 25). Defendant Ross testified that the hood was a few inches short of being open all the way, but that it did not necessitate him having to hold it so it would not fall back. (Ross Deposition, p. 26). However, Plaintiff testified that he believed the hood was in the open position, and for that reason he did not tell either Defendant Ross or Mr. Schaffner to hold the hood open. (Defense Exhibit L). Inspector Horste testified that she did not believe the hood was entirely open and, with clear direction, told Defendant Ross and Mr. Schaffner to hold it open. (Horste Deposition, p. 81). Inspector Horste also testified that she remembered Plaintiff "looking right at" Mr. Schaffner and telling him to hold the hood open, or to hold it tight. (Horste Deposition, p. 82).

After opening the hood, there is some disagreement about where Defendant Ross and Mr. Schaffner were located. According to Plaintiff's testimony, Mr. Schaffner moved to Plaintiff's right to allow him to see the EPA markings in the engine compartment. (Whiting Deposition, pp. 120, 121). Defendant Ross, after opening the hood, moved in front of the truck, behind the hood, where Plaintiff could not see him or his actions. (*Id.*). Plaintiff also testified that, while he

was conducting his one to two minute inspection under the hood, he neither saw nor heard anyone get off the truck. (*Id.* at 122, 123).

Inspector Horste, from her ground-level position on the driver side of the flatbed, could only see Defendant Ross (located on the passenger side of the flatbed) near the hood, not actually holding the right side of it, while she saw Mr. Schaffner holding the left side of the hood. Inspector Horste later testified that she did not actually see Mr. Schaffner's hands gripped on the hood, but believed Mr. Schaffner was holding the hood open because of his posture and his later verbal declaration to her that he doing so. (Horste Deposition, pp. 79, 83, 84).

Defendant Ross and Mr. Schaffner both testified that after opening the hood, Plaintiff ordered them off the truck and onto the ground. They also stated that the hood fell down about one or two minutes after they reached the ground. (Ross Deposition, p. 27; Schaffner Deposition, p. 24).

After the hood fell on Plaintiff's head, neck, and shoulders, Inspector Horste testified that she observed Defendant Ross' hands held up near his shoulders and open like two stop signs. (Horste Deposition, p. 85). She also testified that, seeing neither Defendant Ross nor Mr. Schaffner move, she climbed up onto the flatbed and attempted to raise the hood off Plaintiff, but to no avail. (*Id.*). She yelled at Defendant Ross and Mr. Schaffner to help her and, when they did not, yelled more forcefully and gave a direct order, to which the men responded by pulling the hood off Plaintiff, after he was under it for about one minute. (Horste Deposition, pp. 85, 87–8). Plaintiff testified that, after pulling the hood off him, Defendant Ross said "it slipped." (Whiting Deposition, p. 127). Inspector Horste testified that, in a nearby customs building about five minutes later, both drivers said "it slipped" or "it fell" and one of the drivers said something to the

---

**3.** Defendant Ross, when asked if the entire *flatbed* was setting on a hill, indicated that "the whole *truck*" was "setting on a downward position back-to-front on an incline" (Deposition 25) [emphasis added]. Inspector Horste, when asked if "the truck that you were inspecting at the time that the hood came down on Mr. Whit-

ing, was that *flatbed* on a level surface?" replied "Yes" (Deposition 123) [emphasis added]. It is not clear from any of this testimony whether either the flatbed carrying the two trucks or the trucks (tractors) themselves were on level terrain or not.

effect of "It slipped out of my hand/s." (Horste Deposition. pp. 91, 93).

Following these events, Plaintiff was diagnosed on April 20, 1995, with a soft tissue injury similar to whiplash, which prevented him from working and caused him to enter into a physical therapy program lasting four weeks. (Whiting Deposition, p. 155; Plaintiff Exhibits G–I). He asked to go back on restricted duty and was allowed to do so with hours, lifting, and firearms restrictions. (*Id.*).

### III.  STANDARD OF REVIEW

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[4] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994).

### IV.  ANALYSIS

#### A.  Duty

■ In order to present a prima facie negligence case, the plaintiff must prove the defendant owed him a duty. *Schultz v. Consumers Power Co.*, 443 Mich. 445, 449, 506 N.W.2d 175 (1993); *Ross v. Glaser*, 220 Mich. App. 183, 186, 559 N.W.2d 331 (1997); *Babula v. Robertson*, 212 Mich.App. 45, 536 N.W.2d 834 (1995). A duty is a legally recognized obligation to avoid negligent conduct. *Moning v. Alfono*, 400 Mich. 425, 437, 254

---

**4.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

N.W.2d 759 (1977); *Ross,* 220 Mich.App. at 186, 559 N.W.2d 331. The issue of whether a duty exists is usually one of law to be decided by the trial court, *Schmidt v. Youngs, III,* 215 Mich.App. 222, 224, 544 N.W.2d 743; *Terrell v. LBJ Electronics,* 188 Mich.App. 717, 719–720, 470 N.W.2d 98 (1991), but if the relationship between the parties is not clear, the duty issue may be bifurcated for the court to determine the requisite elements of the relationship, and the jury to determine whether the evidence establishes the elements of that relationship. *Smith II v. Allendale Mutual Insurance Company,* 410 Mich. 685, 714–715, 303 N.W.2d 702 (1981).

■ As a general rule, an individual has no duty to aid or protect another who is endangered by a third party. *Murdock,* 208 Mich.App. at 215, 527 N.W.2d 1; *Brown v. Jones,* 200 Mich.App. 212, 215–216, 503 N.W.2d 735 (1993).[5] However, in determining whether a duty exists, courts consider a wide array of factors, "including the relationship of the parties and the foreseeability and nature of the risk." *Schultz,* 443 Mich. at 450, 506 N.W.2d 175. Therefore, there is an exception to the general rule if the defendant stands in a "special relationship" to either the plaintiff or the person responsible for the injury. *Murdock,* 208 Mich.App. at 215, 527 N.W.2d 1 (*citing Marcelletti v. Bathani,* 198 Mich.App. 655, 664, 500 N.W.2d 124 (1993)).[6] A special relationship may be formed if the defendant "undertakes" to render services to another, be it gratuitous or for legal consideration. *Smith II,* 410 Mich. at 712, 303 N.W.2d 702.

> The rationale behind imposing a duty to protect in the special relationships is based on control. *Williams v. Cunningham Drug Stores, Inc.,* 429 Mich. 495, 499, 418 N.W.2d 381 (1988). When a person en-trusts himself to the control and protection of another and, consequently, loses control to protect himself, the duty to protect is imposed upon the person in control because he is best available to provide a place of safety. *Id.*

*Terrell,* 188 Mich.App. at 720, 470 N.W.2d 98.[7]

■ In this case, the issue of whether Defendant Ross had a duty to hold the hood open during Plaintiff's inspection hinges upon the resolution of underlying facts. In short, the existence of a duty is contingent upon an evaluation of the divergent fact scenarios presented by Plaintiff and Defendants. Although it is proper for the Court to define the parameters of the duty relationship, it is improper for the Court to determine whether the evidence establishes the elements of that relationship.

In support of their case, Defendants properly cite *Smith II v. Allendale Mutual Insurance Company,* in which the court held an insurer's inspection of an insured's premises for fire hazards did not demonstrate an "undertaking" to render fire inspection and prevention services to the insured. 410 Mich. 685, 714–715, 303 N.W.2d 702 (1981). The court stated:

> While an undertaking which may give rise to liability under the rule of [Restatement (Second) of Torts] § 324A may be gratuitous ... the evidence must show that the actor assumed an obligation or intended to render services for the benefit of another. Evidence demonstrating merely that a benefit was conferred upon another is not sufficient to establish an undertaking which betokes a duty. Persons pursuing

---

**5.** There is also no duty to protect an individual from the criminal acts of another. *Babula,* 212 Mich.App. at 49, 536 N.W.2d 834 (*citing Marcelletti v. Bathani,* 198 Mich.App. 655, 664, 500 N.W.2d 124 (1993)).

**6.** *See also, Samson v. Saginaw Professional Bldg. Inc.,* 393 Mich. 393, 406, 224 N.W.2d 843 (1975) ("[T]o require the actor to act, some sort of relationship must exist between the actor and the other party which the law or society views as sufficiently strong to require more that mere observation of the events which unfold on the part of the defendant. It is the fact of existence

of this relationship which the law usually refers to as a duty on the part of the actor.").

**7.** *See also, Mason v. Royal Dequindre, Inc.,* 455 Mich. 391, 398, 566 N.W.2d 199 (1997); *Murdock,* 208 Mich.App. at 215, 527 N.W.2d 1 ("The determination whether a duty-imposing special relationship exists in a particular case involves ascertaining whether the plaintiff entrusted himself to the control and protection of the defendant, with a consequent loss of control to protect himself." (*Citing Dykema v. Gus Macker Enterprises, Inc.,* 196 Mich.App. 6, 9, 492 N.W.2d 472 (1992))).

their own interests often benefits others in the process. *Id.* at 717–718, 303 N.W.2d 702. The court ruled the plaintiffs failed to present evidence sufficient to create a jury question as to whether there was an undertaking to render services, and hence, a duty to one who might forseeably be injured by the actor's failure to perform the undertaking with reasonable care. *Id.* at 718, 303 N.W.2d 702.

In this case, Plaintiff claims Defendant Ross "assumed a distinctive duty when he volunteered to open the hood of the tractor for inspection." (Plaintiff's Brief, p. 4–5). However, the evidence unequivocally shows that Defendant Ross and Mr. Schaffner opened the hood at the insistence of Plaintiff Whiting and his co-worker Ms. Horste. Mr. Whiting stated in his deposition:

Q: What point in time did you—or did you—did you ask someone to reopen the hood?

A: Yes.

Q: Who did you ask?

A: I don't recall who I asked of the drivers.

Q: Did one of the drivers?

A: Both of the drivers were there. I just made the statement could you open the hood.

(Whiting Deposition, p. 116, Defendants Exhibit I).[8] As in *Smith,* nothing in the record suggests that by opening the hood, Defendant Ross intended to render a benefit or service to Mr. Whiting. It appears, and common sense would dictate, that the drivers opened the hood because a U.S. Customs Official had asked them to and because they wanted to clear customs in order to carry out their deliveries.[9]

A juxtaposition of these facts with cases in which courts have found an "undertaking" created a special relationship clarifies that a finding of a special relationship is not warranted under Defendants' rendition of the facts. *See, e.g., Schultz v. Consumers Power Co.,* 443 Mich. 445, 449, 506 N.W.2d 175 (1993) (relationship between utility company and the plaintiff, who was electrocuted when the aluminum ladder he was using while painting a house came near a frayed electrical wire, was sufficient to impose a duty on the utility company, given the company's expertise in dealing with electrical phenomena and delivering electricity); *Babula v. Robertson,* 212 Mich.App. 45, 536 N.W.2d 834 (1995) (babysitter had to exercise reasonable care to ensure the safety of the child); *Terrell v. LBJ Electronics,* 188 Mich.App. 717, 719–720, 470 N.W.2d 98 (1991) (boy scout leader, who voluntarily agreed to transport boy scouts from meeting, assumed a duty to perform carefully, regardless of his status as the troop leader). In all of these cases, an individual made a concerted effort to provide a service to the plaintiff—as a company providing electrical services, as a babysitter providing babysitting services, and as a friend driving kids from a meeting in which he was a participant. According to Defendants, Mr. Ross and Mr. Schaffner undertook no such concerted effort to provide Mr. Whiting with a service, but rather, simply conformed with the request he made as a Custom's Official.

Furthermore, Plaintiff also testified that he never requested that Defendant Ross hold the hood open, nor did he believe that Defendant Ross was going to hold the hood open for inspection.

Q: . . . Just so that I'm clear, you never told Ross to hold the hood open; correct?

A: No.

Q: How did you think the hood was going to stay open?

A: I thought it was in the open position, that it was going to stay open.

Q: So it wasn't even your belief that Ross was holding it; correct?

A: Correct, I thought it was open.

Q: And the reason why you thought this was open is because just based on your own visual inspection that Ross opened it; correct?

8. Plaintiff testified that he refused to open truck hoods "because they're big, bulky, heavy things," and that it took two men to open the hood of the subject vehicles. (Defendants' Exhibit A, pp. 100, 117–118).

9. Defendants claim that the drivers were pursuing their own interests in presenting their vehicles for inspection so they could carry out their deliveries, but the deposition testimony they cite in support of this proposition states nothing of the sort.

A: Yes.

(Whiting Deposition, p. ?, Defendants' Exhibit L). Plaintiff testified that he does not rely on the drivers of semis to insure his safety when doing under-hood inspections, and that he does a visual check to verify that the hoods are open. (Whiting Deposition, p. 102, Defendants' Exhibit M). These factors all indicate that Mr. Whiting did not entrust himself to the control and protection of Defendant Ross and Mr. Schaffner, thereby imposing a duty on them. Such an entrustment, even if it existed, would be anomalous considering Plaintiff is a U.S. Customs official; that is, a typical scenario would involve a citizen entrusting himself or herself to the protection of such an official, not vice versa.[10]

■ Despite the fact that Whiting did not ask for or expect the help of Defendant Ross, a duty may have arose if, by his own volition, Ross held the hood open and subsequently released it. Anytime a person voluntarily assumes the performance of a duty, that person is required to perform the duty carefully. *Terrell*, 188 Mich.App. at 718–722, 470 N.W.2d 98. Plaintiff presents testimony that indicates Defendant Ross was holding the hood open at some point. Customs Inspector Horste testified that after the hood fell, she observed Defendant·Ross's hands up near his shoulders like stop signs, and both Horste and Whiting testified hearing Ross say "it slipped." This version of the facts, if accurate, indicates Defendant Ross did "undertake" the rendering of services to Mr. Whiting, thereby engendering a special relationship between himself and Mr. Whiting. *Smith II*, 410 Mich. at 712, 303 N.W.2d 702.

Therefore, because the determination of whether a duty existed is contingent upon the resolution of disputed facts, the issue of whether a duty arose would be properly left for a jury in this case. As such, Defendants' Motion for Summary Judgment on this issue is Denied.

### B. Proximate Cause

■ Under Michigan law, Plaintiff must prove Defendants' actions were the proximate cause of his injury. The mere possibility of causation is not enough, and the "casual sequence of events posited by plaintiff, although conceivably true," must be based on evidence and cannot be "wholly speculative." *Moody v. Chevron Chemical Co.*, 201 Mich.App. 232, 238, 505 N.W.2d 900 (1993) (in a wrongful death action stemming from an allergic reaction to a bee sting, the court ruled that because the stinging bee was not recovered, plaintiff could not prove that the bee that stung his son came in contact with the pesticide produced by the defendant, or that its behavior was caused by the pesticide). *See also, Pete v. Iron County*, 192 Mich.App. 687, 481 N.W.2d 731 (1992) (Plaintiff admitted that she did not know what caused her to slip on courthouse stairs and that she might have slipped because of water on the stairs or could have fallen because of the type of shoes she was wearing or because of the material the stairs were made of and whose expert testified during deposition that he did not know what caused the plaintiff's fall did not establish casual link between the accident on the courthouse stairs and any negligence on the part of the county). Conclusions unsupported by an allegation of facts do not suffice to establish a genuine issue of material fact. *Easley v. University of Michigan*, 178 Mich.App. 723, 726, 444 N.W.2d 820 (1989).

■ In this case, there is a sufficient amount of evidence for a reasonable jury to conclude that Defendant Ross proximately caused Plaintiff's injuries. Although Mr. Whiting could not confirm that Defendant was actually holding the hood, a jury could draw a legitimate inference from other facts that he was holding the hood. First, after the hood was lifted from Mr. Whiting's body, Defendant allegedly apologized and said, "it slipped." While the phrase "it slipped" is equivocal (it could be he was saying it slipped from his hands or simply that it slipped out of its upright position), it is for a jury to decide whether Ross made the statement and what inference to draw from his

---

**10.** Plaintiff does not address the issue of whether Defendants undertook a duty then abandoned it by holding the hood open then failing to keep it open. This may be sufficient to survive summary judgment because there is conflicting testimony, i.e., a genuine issue of fact, as to whether or not the drivers ever held the hood, whether they warned Mr. Ross the hood was not opened all of the way, and whether Mr. Ross told Mr. Whiting that the hood slipped (and what that meant).

doing so.[11] Ms. Horste further testified that, upon returning to the station, one of the drivers said something to the effect of "it slipped out of my hand/s." (Horste Deposition, p. 91, 93). Second, although Ms. Horste testified she could not recall seeing the left driver's fingers on the hood, she believed him to be holding the hood due to his body posture and due to his subsequent declaration that he was holding the hood. (Horste Deposition, p. 127, Plaintiff's Exhibit B). These allegations are sufficient to make the Plaintiff's causation claim something more than "wholly speculative." The Court rejects Defendants contention that any evidence short of Mr. Whiting or Ms. Horste actually seeing one of the drivers hands on the hood is insufficient to establish that Defendant Ross proximately caused the injury. Therefore, Plaintiff presents sufficient evidence to withstand Defendants' Motion for Summary Judgment on this issue.

## C. Fireman's Rule

█ The "fireman's rule" is an age-old common law rule that prevents police officers, or public safety officers,[12] and fireman from recovering damages for injuries: (1) deriving from negligence causing the officers presence, and (2) stemming from the normal risks of the officers profession. *Woods v. City of Warren,* 439 Mich. 186, 196, 482 N.W.2d 696 (1992); *Atkinson v. City of Detroit,* 222 Mich.App. 7, 9–10, 564 N.W.2d 473 (1997); *Stehlik v. Johnson,* 206 Mich.App. 83, 86, 520 N.W.2d 633 (1994). Here, we need only address the second prong, which prevents recovery for injuries arising out of the inherent risks of these professions, *Mariin v. Fleur, Inc.,* 208 Mich.App. 631, 632–633, 528 N.W.2d 218 (1995) (*citing Kreski v. Modern Wholesale Electric Supply Co.,* 429 Mich. 347, 351, 415 N.W.2d 178 (1987)), and thus the analytical focus is on whether the injury stems directly from an officer's functions.

*Woods,* 439 Mich. at 193, 482 N.W.2d 696; *Stott v. Wayne County,* 224 Mich.App. 422, 569 N.W.2d 633 (1997); *Mariin,* 208 Mich. App. at 632–635, 528 N.W.2d 218; *Stehlik,* 206 Mich.App. at 86, 520 N.W.2d 633. The rationale for the rule:

> stem[s] from the nature of the service provided by fire fighters and police officers ... It is apparent that these officers are employed for the benefit of society in general, and for people involved in circumstances requiring their presence in particular ... The public hires, trains, and compensates the fire fighters and police officers to deal with dangerous but inevitable situations ... The rule developed from the notion that taxpayers employ fireman and policemen, at least in part, to deal with future damages that may result from the taxpayer's own negligence. To allow actions by policemen and firemen against negligent taxpayers would subject them to multiple penalties for protection.'

*Atkins v. Northwest Airlines, Inc.,* 737 F.Supp. 409, 411 (E.D.Mich.1989) (*citing Kreski,* 429 Mich. at 365–366, 415 N.W.2d 178). *See also, Stott,* 224 Mich.App. at 426–428, 569 N.W.2d 633; *Atkinson,* 222 Mich. App. at 10, 564 N.W.2d 473 ("the purpose of safety professions is to confront danger and, therefore, the public should not be liable for damages for injuries occurring in the performance of the very function police officers and fire fighters are intended to fulfill." (*citing Kreski,* 429 Mich. at 368, 415 N.W.2d 178)).

█ In this case, then, the issue is whether Mr. Whiting, a U.S. Customs Official, is a public safety officer, and therefore barred from recovery under the rule. Most of the cases cited above, and indeed, most cases on the topic, involve normal police officers or fire fighters. *See e.g., Woods,* 439 Mich. 186, 482 N.W.2d 696; *Atkinson,* 222 Mich.App. 7,

---

11. Plaintiff claims that an apology alone is not enough to establish proximate cause, and cites *State v. Canady,* 80 Hawai'i 469, 911 P.2d 104 (1996), in support of this proposition. This case is inapplicable for several reasons: first, it was a criminal case, and the court held an apology alone would not amount to evidence that support a conviction; second, the phrase, "it slipped," are not just an apology, but possibly a description of the events that occurred that day.

12. Some cases refer to police officers, and others refer to public safety officers. This semantic divergence is important because it may help to define the scope of the rule. In this case, one issue is whether the rule applies to Customs Officials. Most recently, the *Stott* case referred to "public safety professions" and "public safety officers."

564 N.W.2d 473; *Mariin,* 208 Mich.App. 631, 528 N.W.2d 218; *Stehlik,* 206 Mich.App. 83, 520 N.W.2d 633. However, the Court finds the rule should apply in this case for the following reasons.

A proper analysis of this issue must focus not on labels or job titles, but rather on the actual nature of the work the person is expected to perform and how that work fits or does not fit the policies that underlie the "fireman's rule." The policy rationale behind the fireman's rule indicates it should be applied to Customs Officials. Mr. Whiting was hired and trained by the U.S. Government to enforce the customs laws for the benefit of society at large. *See Kreski,* 429 Mich. at 365–366, 415 N.W.2d 178. As a policy matter, Mr. Whiting's job is not distinguishable enough from that of a police officer to warrant the non-application of the rule. There is, to be sure, a certain amount of risk in becoming a Customs Inspector—but that risk is inextricably bound to the Inspectors' everyday job. Indeed, one of the aspects for which the public pays Customs Inspectors is putting themselves at risk, if necessary, to enforce federal law.

Courts routinely include "public safety officers" within the fireman's rule, and do not limit the rule's application to fireman and police officers. Here, Plaintiff, as a customs officer, undoubtedly qualifies as a public safety officer, as his job description indicates that he is employed by the United States government to enforce "Customs and other agency laws and regulations." (Defendants Exhibit U). Moreover, the federal law pertaining to public safety officer death and disability benefits defines a "public safety officer" as: "any individual serving a public agency in an official capacity, with or without compensation, as *a law enforcement officer,* firefighter, rescue squad member or ambulance crew member." 28 C.F.R. § 32.2(j) (emphasis added) (Defendants' Brief, p. 7–8). The essence of Mr. Whiting's job is to enforce the Customs laws, and therefore, as a law enforcement officer, he is also a public safety officer.

A recent Michigan appellate decision is illustrative of the way courts approach determinations in this area. In *Stott v. Wayne County,* 224 Mich.App. 422, 569 N.W.2d 633 (1997), the plaintiff argued the fireman's rule should not apply to unarmed deputy sheriffs guarding inmates at a county jail. The court held that the rule did apply because preventing the escape of an inmate is a fundamental function of a public safety officer. *Id.* at 426–428, 569 N.W.2d 633. The application of the rule to unarmed sheriffs deputies guarding inmates clarifies that the rule's scope extends further than prototypical police or fire officers. If an unarmed jail guard is precluded from recovering under the rule, Mr. Whiting, an armed inspector charged with enforcing Customs laws and regulations, should certainly be within the rule as well.

■ Having determined that Mr. Whiting comes within the definition of public safety officer, we must now inquire as to whether his injury stemmed from his official duties. It is undisputed that, according to his U.S. Customs Job Description, Plaintiff's employment as a Customs Inspector "requires considerable and strenuous physical exertion such as lifting heavy objects, crouching or crawling in restricted areas, climbing, and defending oneself or others against physical attack, resorting to the use of firearms only as a last resort." (Defendants' Brief, p. 12, Defendants Exhibit U, p. 24). Moreover, the Plaintiff's "work environment involves high risks with exposure to potentially dangerous situation requiring a range of safety precautions. [sic] Subject to possible physical attack, including the use of lethal weapons, or mob conditions in which circumstances cannot be controlled." (Defendants Brief, p. 12–13, Defendants Exhibit U, p. 24). Plaintiff was injured while looking under the hood to obtain customs information pertaining to the vehicle seized. As various portions of Plaintiff's deposition indicate, this was a normal and ordinary activity for him to perform. The under-the-hood inspection was obviously necessary for Plaintiff garner information needed to properly discharge his duties. Therefore, as the injury was sustained while Plaintiff was discharging his official duties, he should be barred from recovering for said injuries by the fireman's rule.

## V. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment is GRANTED.